# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MICHAEL A. BRADY,            )
FRANK C. O'BRIEN,           )
                                 )
          Plaintiffs,      )
                                 )
-vs-                          )     Case No. 10-CV-284-SPF-FHM
                                 )
UBS FINANCIAL SERVICES, INC.,  )
and GREATER SOUTHWESTERN   )
FUNDING CORPORATION,       )
                                 )
          Defendants.    )

## ORDER

Plaintiffs, Michael A. Brady and Frank C. O'Brien, have brought this action individually and as Rule 23 class representatives against defendants, Greater Southwestern Funding Corporation ("GSW") and UBS Financial Services, Inc. ("UBS"), for judgment on Series B Serial Zero Coupon Bonds ("B Bonds"), issued by GSW. Plaintiffs seek judgment against UBS on theories of instrumentality liability, alter ego liability and agency liability. The court certified the action as a class action pursuant to Rule 23(b)(3), Fed. R. Civ. P. The class consists of:

> All current owners or current beneficial holders of matured Serial Zero Coupon Series B Bonds issued by Greater Southwestern Funding Corporation and initially sold under a Prospectus dated April 1, 1985, including all after-market purchasers, but excluding Greater Southwestern Funding Corporation, and UBS Financial Services, Inc., their subsidiaries and affiliates, and those persons who were employees, officers, managers or directors of UBS (formerly known as PaineWebber Incorporated).

*See*, Order, doc. no. 114.

The following motions are currently before the court:

1.      Motion of Plaintiffs for Partial Summary Judgment Against Greater Southwestern Funding Corporation (doc. no. 147);

2.      The Motion of Defendant UBS Financial Services, Inc. for Summary Judgment (doc. no. 149);

3.      Defendants' Motion for Summary Judgment (doc. no. 151);

4.      Defendants' Motion to Certify Question to State Court (doc. no. 252); and

5.      Motion of Defendants Requesting Court to Take Judicial Notice (doc. no. 253).

The briefing for all motions is complete.  After careful study of the parties' papers, the court now rules on the motions.

## I.     Motion of Defendants Requesting Court to Take Judicial Notice

Defendants, pursuant to Rule 201, Fed. R. Evid., request the court to take judicial notice of certain documents filed in the "Stephens litigation."[1] According to defendants, the alter ego allegations asserted by plaintiff in the Stephens litigation against PaineWebber Incorporated ("PWI"), now UBS, are the same as those presently asserted by plaintiffs in this action.

Plaintiffs object to defendants' motion.  Rule 201, they argue, limits judicial notice to adjudicative facts, as opposed to, legislative facts.  Plaintiffs assert that defendants have not identified any specific adjudicative facts appropriate for judicial notice.  Additionally, plaintiffs argue that the court should not judicially notice Judge Burrage's unpublished opinion.  Plaintiffs contend that Rule 201 should not extend to recognition of a legal opinion as correct.  Plaintiffs also assert that the exhibits embedded in the Stephens pleadings are not proper for judicial notice since defendants

---

[1]   Stephens Property Company v. PaineWebber Incorporated and Greater Southwestern Funding Corporation, Case No. 97-CV-45-BU.

have not identified any adjudicative facts in any of those exhibits.  Further, plaintiffs contend that judicial notice applies only to adjudicative facts which are not subject to reasonable dispute.  Plaintiffs maintain that defendants have not shown the existence of any adjudicative facts which are undisputed.  In addition, while plaintiffs recognize that the court may take judicial notice of the existence and content of materials, plaintiffs assert that the court need not take judicial notice of the truth or accuracy of the contents. Finally, plaintiffs argue that defendants' motion is without merit because defendants are attempting to add legislative facts, out of time and without proof of relevance, to UBS' pending motion for summary judgment regarding the alter ego issue.

Defendants, in reply, maintain that they are not asking this court to adopt Judge Burrage's findings of fact and conclusions of law in the Stephens case.  According to defendants, they are simply asking the court to take judicial notice of the allegations made by the Stephens plaintiff.  They want the court to take judicial notice that the allegations in the Stephens case concern the same matters as are at issue in this case. Defendants argue that they do not ask the court to determine any disputed facts or any disputed issue by means of judicial notice.

The court, upon review, concludes that defendants' motion should be granted to the following extent: the court shall take judicial notice of the existence and contents of the documents, and Judge Burrage's unpublished opinion, as attached to defendants' motion.  The court concludes that it is appropriate to take judicial notice of its records.  Tal v. Hogan, 453 F.3d 1244, 1264 n. 24 (10th Cir. 2006).  However, in so doing, the court does not take judicial notice of the truth, accuracy or correctness of any allegation, argument, statement, finding or conclusion in the documents, including Judge Burrage's unpublished opinion.  *Id*.  Plaintiffs are not prejudiced by this ruling.  The court has simply reviewed the proffered documents to examine the

3

allegations and arguments made by the parties to the court in the Stephens case in support of and in opposition to the alter ego theory of liability. Plaintiffs have had an opportunity to demonstrate how and why those allegations and arguments differ from those presented in this case and why Judge Burrage's determination should not govern this case.

## II. Defendants' Motion to Certify Question to State Court

Defendants request the court to certify three proposed questions of law to the Supreme Court of Delaware, in accordance with Rule 41 of that Court. Rule 41 provides in pertinent part:

> [A] United States District Court . . . may, on motion or sua sponte, certify to this Court for decision a question or questions of law arising in any matter before it prior to the entry of judgment or decision if there is an important and urgent reason for an immediate determination of such question or questions by this Court and the certifying court or entity has not decided the question or questions in this matter.

Ex. A to defendants' motion. The three questions as to which defendants request certification relate to the alter ego theory of liability asserted by plaintiffs against UBS. Defendants contend that this court has previously decided, and there is no dispute amongst the parties, that Delaware law governs plaintiffs' request for a veil piercing remedy. According to defendants, the Delaware Supreme Court has been highly receptive, and even invites other courts, to certify to it novel questions of Delaware corporate law. Indeed, defendants point out that a New York district court recently certified questions of law to the Delaware Supreme Court which the Court accepted within 21 days. Defendants contend that plaintiffs' alleged alter ego theory of liability raises novel issues of law which makes certification appropriate. In

4

particular, defendants maintain that the Delaware Supreme Court has never addressed whether there can be a disregard of corporate separateness based upon a violation of the "policies" of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, years after the governing statute of repose has run.  Consequently, defendants contend, in substance, that it would be highly desirable to obtain definitive guidance from the Delaware Supreme Court as to the viability of plaintiffs' alter ego theory of liability.

In their motion, defendants set forth two and one-half pages of "Facts to be Assumed" and based upon those facts, sets forth the following proposed certified questions of law:

> 1.  Where Plaintiffs do not allege reliance on the ability of a single-purpose, bankruptcy-remote Delaware corporation to pay bonds that it issued and that Plaintiffs purchased, and where Plaintiffs do not allege nondisclosure or fraud with respect to the corporate form or structure of that Delaware issuer, may Plaintiffs nevertheless pierce the corporate veil of that issuer and disregard its corporate separateness to hold a firm commitment underwriter and reseller of those bonds liable for the issuer's contract debt?

> 2.  Does Delaware law permit the disregard of corporate separateness so as to allow bondholders of a single-purpose, bankruptcy-remote Delaware corporation to pierce the corporate veil to obtain payment on the contract debt of the bonds issued by that corporation from a firm commitment underwriter and reseller of those bonds, where corporate formalities relating to the issuing corporation were undisputedly followed, corporate assets are not alleged to have been commingled, and the registration statement and prospectus by which the bonds were offered and sold accurately disclosed to purchasers of those bonds the identity, relationships and financial wherewithal of the issuer corporation and the source of payment on the bonds, on the theory that the prospectus omitted material information regarding credit and market risks and the value of collateral for the bonds which would allegedly constitute a violation of Section 11 of the Securities Act of 1933, if a claim had been timely brought thereunder?

3.  Can an alleged violation of the policies of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, for alleged material omissions provide the necessary element of "fraud, injustice or inequity in the use of the corporate form" to justify piercing the corporate veil under Delaware law to hold an underwriter, here UBS, liable for the contract debt of an issuer, here GSW, where Section 11 of the Securities Act of 1933 originally provided means for redress by way of an underwriter liability claim, 15 U.S.C. § 77k, and/or control person liability claim, 15 U.S.C. § 77o, against that underwriter, but where any such means for redress has been subsequently extinguished under the applicable statute of repose, 15 U.S.C. § 77m?

Plaintiffs oppose to defendants' motion on several grounds.  First, plaintiffs do not agree that Delaware law applies to the alter ego issue.  They assert that two of defendants' questions directly implicate federal law, not Delaware law, while the third question implies the involvement of federal law.  Plaintiffs contend that federal common law applies in situations, like the instant case, where a federal policy requires a uniform national alter ego rule, and the application of a state rule might frustrate specific objectives of federal law.  Although plaintiffs' counsel made a "fleeting and ambiguous statement" in these proceedings that Delaware law applies to the alter ego issue, plaintiffs contend that they are not judicially estopped from urging the court to follow federal common law in addressing the alter ego issue.  Next, plaintiffs contend that defendants' assumed facts are disputed, as shown in plaintiffs' responses to defendants' motions for summary judgment, and therefore they disqualify the questions for certification.  Plaintiffs additionally maintain that none of the proposed questions definitively resolve any issue in this case, again disqualifying the questions for certification.  Plaintiffs also assert that the questions are improperly framed.  Further, plaintiffs argue that defendants' motion is untimely as it is filed on the eve of trial and the requested certification will only cause inappropriate delay.  Plaintiffs point out that while the Delaware Supreme Court accepted certification from the New

York district court in 21 days, the Court's opinion was not issued until six months later. Finally and in the alternative, plaintiffs contend that defendants have failed to demonstrate that the questions to be certified meet the specific requirements of Rule 41.

In reply, defendants argue that Delaware law applies because this court sits in diversity jurisdiction, and under Oklahoma's choice-of-law rules, veil piercing liability is determined by reference to the law of the state of incorporation, *see*, Canal Insurance Co. v. Montello, Inc., 822 F. Supp. 2d 1177, 1183 (N.D. Okla. 2011), which in this case is Delaware. Defendants point out that Judge Burrage ruled in the Stephens litigation that Delaware law applied to the alter ego issue. In addition, they contend that plaintiffs orally conceded the point in proceedings in this case and that plaintiffs' counsel's statement in that regard was not a "fleeting and ambiguous statement." Defendants contend that application of federal common law is not necessary because there is no federal statutory liability to vindicate in this case. While Section 11 makes an issuer, like GSW, and an underwriter, like UBS, liable for misrepresentations and omissions of material facts from a registration statement, any such liability was extinguished 25 years ago by the governing statute of repose, 15 U.S.C. § 77m. Even if plaintiffs were not aware of the facts supporting such a claim prior to the expiration of the statute of repose, defendants contend that the statute is not subject to equitable tolling or other equitable considerations. Defendants argue that plaintiffs' about-face on the application of Delaware law to their veil piercing request speaks volumes as to the absence of any meaningful basis upon which to distinguish Judge Burrage's holding in favor of UBS on the alter ego issue in the Stephens litigation. Defendants also assert that because plaintiffs have yet to provide any authority that they are entitled to disregard the corporate separateness of UBS and GSW under Delaware law based upon a federal "policy," certification of the question

7

to the Delaware Supreme Court is warranted. Finally, defendants argue that plaintiffs' quibbles as to the form of the certified questions misses the point because it is the court that certifies the form of the question and the stipulated or assumed facts for consideration.

Certification of a question to state court is within the "sound discretion" of the federal court. Lehman Bros. v. Schein, 416 U.S. 386, 390-391 (1974). Here, the court declines to exercise its discretion to certify. According to Rule 41, the Delaware Supreme Court will not accept certification if the facts material to the issue certified are in dispute. *See*, Ex. A ("A certification will not be accepted if facts material to the issue certified are in dispute.") Although defendants are willing to present the Delaware Supreme Court with assumed facts, the court is not convinced that the parties or the court itself can provide the Delaware Supreme Court with assumed facts to which everyone can agree. Moreover, defendants have requested certification on the eve of trial after the summary judgment motions have been fully briefed and under the court's consideration for some time.

The court concludes that certification of this case to the Delaware Supreme Court would unduly delay the proceedings in this case. The case was originally filed in 2006. Defendants have been aware of the alter ego issue for a long time. They have had ample time to seek certification as to any matters they thought should be submitted to the Delaware court. Furthermore, resort to certification is not obligatory. *See*, Lehman Bros., 416 U.S. at 391. "Indeed, under the diversity statutes the federal courts have a duty to decide questions of state law even if difficult or uncertain." Colony Ins. Co. v. Burke, 698 F.3d 1222, 1235 (10th Cir. 2012) (quotation omitted). The court concludes that this case, as it now stands, does not warrant certification to the Delaware Supreme Court of the questions proposed by defendants.

The court now turns to the choice of law issue raised by plaintiffs. Although plaintiffs, in support of their position[2] that federal common law should apply to the alter ego issue, have not cited any cases where the courts have applied federal common law to an alter ego claim while exercising diversity jurisdiction,[3] the court need not decide whether plaintiffs' position is correct. As noted by the Supreme Court in <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998), "'the choice between state and federal [veil-piercing] law may in many cases present questions of academic interest, but little practical significance.'" *Id.* at 63, n. 9 (quoting <u>In re Ascushnet River & New Bedford Harbor Proceedings</u>, 675 F. Supp. 22, 23 (D. Mass. 1987)). The court concludes that this is such a case. In <u>Mobil Oil Corporation v. Linear Films, Inc.</u>, 718 F. Supp. 260, 268 (D. Del. 1989), the court, exercising federal question jurisdiction, declined to "launch into a protracted choice of law analysis" as to whether federal, Delaware or Oklahoma common law applied to the alter ego issue. The court found the outcome would be the same. "Fraud or something like it is required." *Id.* at 268. The cases cited by the court in <u>Mobil Oil Corporation</u> to support its decision as to the

---

[2]In the court's view, plaintiffs' counsel's acknowledgment that the veil piercing issues are governed by Delaware law was clearly not "fleeting and ambiguous." In addition, the court notes that plaintiffs, in opposing UBS' summary judgment on the alter ego issue, have not specifically argued that federal common law governs the alter ego issue. Instead, plaintiffs state "[i]n considering whether to pierce the corporate veil under Delaware law, the Court should not let state law considerations override federal securities policy." *See*, Memorandum of Law of Plaintiffs in Opposition to the Motion of Defendants UBS Financial Services, Inc. For Summary Judgment (doc. no. 185). Although the court does not find that plaintiffs have waived or are estopped from arguing that federal common law applies, the court need not decide the issue.

[3]The court notes that plaintiffs cite a law review note, <u>Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law</u>, 95 Harv. L. Rev. 853 (1982), n. 77, wherein the author states that diversity cases have used federal alter ego standards rather than applicable state law, citing <u>CM Corp. v. Oberer Dev. Co.</u>, 631 F.2d 536, 538-539 (7th Cir. 1980). That case, however, has been called into doubt by <u>Van Dorn Co. v. Future Chemical and Oil Corp.</u>, 753 F.2d 565, 570-571 (7th Cir. 1985); *see also*, <u>Joiner v. Ryder System, Inc.</u>, 966 F. Supp. 1478, 1483 n. 8 (C.D. Ill. 1996) ("[CM Corp.] case, however, essentially is no longer "good" law.") (citing <u>Van Dorn</u>).

applicable federal common law and Delaware law are the same as those plaintiffs cited in their response to UBS's summary judgment motion on the alter ego issue. *See*, plaintiffs' response, p. 35, n. 9. One of those cases, <u>Pauley Petroleum, Inc. v. Continental Oil Co.</u>, 239 A.2d 629 (Del. 1968), is specifically relied upon by plaintiffs in support of their alter ego theory of liability. In that case the Delaware Supreme Court, referring to the case of parent and subsidiary corporations, stated:

> There is, of course, no doubt that upon a proper showing[,] corporate entities as between parent and subsidiary may be disregarded and the ultimate party in interest, the parent, be regarded in law and fact as the sole party in a particular transaction. This, however, may not be done in all cases. It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved.

*Id.* at 633. Plaintiffs, in support of their theory, contend that the alleged violation of the policies of Section 11 of the Securities Act of 1933 constitutes a "contravention of law" or a "public wrong."

In their summary judgment papers, plaintiffs also rely upon the decision in <u>Harco Nat'l Ins. Co. v. Green Farms, Inc.</u>, 1989 WL 110537 (Del. Ch. Sept. 19, 1989), wherein the court pointed out that "[f]raud has traditionally been sufficient reason to pierce the corporate veil," but "[o]ther grounds also exist." *Id*. at *5. The court then set forth the following alter ego analysis from <u>United States v. Golden Acres, Inc.</u>, 702 F. Supp. 1097 (D. Del. 1988):

> [A]n alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid,

10

> corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id*. at *5 (quoting Golden Acres, 702 F. Supp. at 1104).  The court then stated:

> The District Court emphasized "that no single factor could justify a decision to disregard the corporate entity, but that some combination of them was required, and that an overall element of injustice or unfairness must always be present, as well."

*Id*.  Plaintiffs assert that the violation of the policies of Section 11 also constitutes an injustice or unfairness.  It has been stated that the court's reliance on a federal case, applying federal common law, in <u>Harco</u> suggests "there is little difference between the veil-piercing law of Delaware and the emerging federal common law on the subject." Stephen B. Presser, <u>Piercing the Corporate Veil</u>, § 2.8 (2012).[4]

Because the difference between federal common law and Delaware law appears to be immaterial, the court concludes that it will continue with its application of Delaware law on the issue of alter ego liability as to defendant, UBS.  As is discussed below in another section of this order, the court will rely on both <u>Pauley</u> and <u>Harco</u> in examining plaintiffs' alter ego theory of liability.

---

[4] In addition, the court in <u>Golden Acres</u> concluded that "the Delaware test for piercing the corporate veil is altogether compatible with the federal analysis laid out in [United States v.] Pisani[, 646 F.2d 83 (3d Cir. 1981)].  It is simply broader."  702 F. Supp. at 1104 (citing <u>Pauley</u>, 239 A.2d at 633).

III.   Motion of Plaintiffs for Partial Summary Judgment Against Greater Southwestern Funding Corporation

Plaintiffs move under Rule 56(a), Fed. R. Civ. P.,[5] for partial summary judgment against defendant, GSW, "finding [GSW] has failed to pay on the Stated Maturity dates on and after June 1, 2001, the Serial Zero Coupon B Bonds ("B Bonds") with a Stated Maturity value of $156,650,000 in the aggregate principal amount (the "Subject B Bonds"), which were sold subject to a Prospectus dated April 1, 1985, and awarding damages of principal, and default interest against [GSW] in an amount to be approved by the Court as due to members of the Certified Class on the Subject B Bonds held by them pursuant to claims filed." *See*, doc. no. 147, at 1.

Plaintiffs argue that GSW has admitted during discovery that it has not paid any of the B Bonds upon their Stated Maturity as defined in the Collateral Trust Indenture ("Indenture"). Plaintiffs assert that the term "B Bonds" was defined for purposes of discovery as the serial zero coupon bonds "that were first registered in June, 1984, and the subject of a Prospectus dated April 1, 1985." Ex. D to plaintiffs' motion. The term

_____

[5] Rule 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense– on which summary judgment is sought." The standard of review for this motion and the other motions for summary judgment discussed in this order is as follows. Summary judgment shall be granted under Rule 56(a) if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

"Prospectus" was defined as the "certain document dated April 1, 1985 pertaining to Greater Southwestern Funding Corporation Collateral Trust Bonds $182,000,000 Serial Zero Coupon Series B Due 1999-2009." *Id.* Plaintiffs contend that the $182 million in B Bonds offered under the Prospectus were all sold to and held by class members after April 1, 1985. Plaintiffs also maintain that the B Bond certificates, as well as the Indenture under which the B Bonds were issued, provide that the right to payment of the principal and interest on the B Bonds is "absolute and unconditional." In addition, plaintiffs assert that GSW has admitted that the various Stated Maturity dates for the $182 million in B Bonds are those shown on the first page of the Prospectus. Plaintiffs point out that although the Stated Maturity dates listed on the first page of the Prospectus have all passed and demand for payment has been made, GSW has admittedly made no payments on the B Bonds. Plaintiffs maintain that the unpaid B Bonds with a Stated Maturity after May 31, 2001,[6] have a maturity value of $156,650,000. Based upon the undisputed evidence, plaintiffs thus contend that GSW owes the aggregate principal amount due at Stated Maturity of $156,650,000, and post-maturity interest at the rate of 15% per annum, commencing on the Stated Maturity dates from June 1, 2001 through June 1, 2009, as shown on the first page of the Prospectus. Consequently, plaintiffs assert that partial summary judgment should be granted against GSW with the court making the "finding" previously described.

Defendants respond that plaintiffs' motion, which is a renewal of a previously-withdrawn partial summary judgment, fails for the same reasons that

---

[6] The class action was originally filed on May 31, 2006. The statute of limitations for breach of contract claims, such as plaintiffs, is five years. *See*, 12 O.S. 2011 § 95(A)(1). In their motion, plaintiffs do not seek a finding as to liability on the B Bonds with a Stated Maturity before May 31, 2001. In footnote 2 of the motion, plaintiffs state that they intend at a later date to prove liability as to the remainder of the B Bonds, those with Stated Maturity before May 31, 2001, based upon allegations of equitable tolling and estoppel.

doomed the prior motion.  Specifically, defendants assert that plaintiffs have failed to present evidence that either named plaintiff currently owns a B Bond.  The redacted bond attached to plaintiffs' motion, defendants point out, has a different maturity date than the B Bonds alleged to have been purchased by plaintiffs per the amended complaint.  Defendants also argue that plaintiffs have failed to show that the redacted bond is owned by any member of the certified class.  Moreover, defendants contend that Section 1.02 (D) of the Indenture requires that "[t]he ownership of Bonds shall be proved by the Bond Register."  Defendants point out that plaintiffs have not produced the Bond Register nor have they submitted any evidence to show that either named plaintiff is listed in the Bond Register.

In addition, defendants contend that plaintiffs' motion is overbroad. Defendants maintain that plaintiffs' contract claims, with respect to the B Bonds having maturity dates on and prior to June 1, 2001, are time-barred.  Defendants additionally argue that plaintiffs' motion is overstated in that plaintiffs fail to account for the fact that the Collateral Indenture Trustee has marshaled, liquidated and distributed to the bondholders all collateral underlying the B Bonds.  Defendants argue that the Trustee has recovered all of the assets of GSW and that suing GSW twice for the same default on the B Bonds will not change the result.  Defendants also contend that, coupled with payments made to bondholders in the foreclosure proceedings, the payments to bondholders total several million dollars more than the aggregate offering price of the B Bonds, with the result that plaintiffs have been paid more than their initial investments (an assertion which, even if true, impresses the court not at all).  Defendants further assert that in light of the foreclosure action and the fact that the Trustee has recovered everything that could be gotten from GSW, plaintiffs should not be permitted to continue with this action.

Finally, defendants state that in support of their motion, plaintiffs have submitted a two-year-old declaration of Larry J. Card, an individual who has never been identified in Rule 26 disclosures and who has never been listed on any witness list. Defendants contend that plaintiffs' motion should be denied on this basis alone. Alternatively, defendants contend that plaintiffs should be ordered to produce Mr. Card for deposition and defendants should have an opportunity to take discovery (documents and deposition) of Mr. Card.

In reply, plaintiffs argue that defendants have shown no authority to support their position that exact damages must be calculated at this stage of the litigation. According to plaintiffs, all issues regarding proof of ownership and damages can and will be resolved in the claim verification process if and when UBS is found liable for payment on the B Bonds. In addition, plaintiffs contend that uncontested proof of ownership of the B Bonds in the form of brokerage statements of both plaintiffs is attached as exhibit 3 to the amended complaint. Although GSW answered plaintiffs' amended complaint concerning plaintiffs' ownership of B Bonds by stating that it was without sufficient information to determine the truth or falsity of the allegations, plaintiffs argue that the court should take GSW's statement as an admission, since GSW has failed to inquire during discovery regarding plaintiffs' purchase and current ownership of the B Bonds. Plaintiffs assert that defendants also have failed to inquire of them, during deposition, of the genuineness of their brokerage records, and they point out that defendants' denial of their ownership of B Bonds is in the body of their brief and not in any statement of disputed fact (arguing, correctly, that a denial of a fact is not sufficient to show that a fact is "disputed"). As to defendants' argument regarding the Bond Register, plaintiffs contend that "[s]uch matters are normally proven in the course of payments of claims, just as they are now being handled by the" paying agent in the foreclosure case. Doc. no. 217, at 8. In addition, plaintiffs assert

15

that they have not argued in their motion that "no payments" have been made on the B Bonds – pointing out that their assertion has been that none of the B Bonds have been paid at their stated maturity. The distributions from the intervenor's action in the foreclosure proceedings, plaintiffs assert, were not paid by GSW. They were obtained from the Collateral Indenture Trustee by way of settlement of the intervention claims and the certified class in that case is not identical to the certified class in this case. Plaintiffs also assert that the foreclosure judgment does not relieve GSW of its liabilities on the B Bonds, pointing out that the Collateral Indenture Trustee did not sue on the B Bonds for "principal or interest due." The foreclosure case was an action on the Series B Notes, not on the B Bonds. While the Series B Notes were non-recourse, plaintiffs assert that the B Bonds are separate instruments. Plaintiffs contend the "No Recourse" provision of Section 8.03 of the Indenture is trumped by the phrase in Section 9.12 of the Indenture which states "[n]otwithstanding any other provision." Finally, as for Mr. Card, plaintiffs contend that he is not a testifying witness but an authenticating witness. And plaintiffs contend that defendants have shown no prejudice because of the non-disclosure of Mr. Card. Thus, plaintiffs contend that Mr. Card's declaration should remain in evidence.

The court, upon review, concludes that plaintiffs' motion should be denied. Although the "finding" plaintiffs request the court to make is carefully worded so as not to require the court to make a finding as to the specific breach of contract claims of the named plaintiffs or as to the members of certified class, the court concludes that the named plaintiffs, on their own behalf and as well as on behalf of the class, are essentially requesting the court to grant partial summary judgment as to issue of GSW's liability on their breach of contract claims. However, as pointed out by defendants, plaintiffs have not offered proof of current ownership of any of the B Bonds in their motion. Nor have they shown that they are current beneficial holders

of any of the B Bonds.  Plaintiffs assert in their reply that proof of ownership is shown in exhibit 3 to the amended complaint.  While the court has discretion to consider other materials not cited in a motion, the court declines to do so.  *See*, Rule 56(c)(3), Fed. R. Civ. P. ("The court need consider only the cited materials, but it may consider other materials in the record.")  Here, plaintiffs were previously placed on notice of an objection by defendants regarding plaintiffs' failure to offer proof of ownership when they filed the first partial summary judgment motion.  Plaintiffs knew that proof of ownership would be an issue if the motion were renewed.  However, in filing the renewed motion, plaintiffs submitted no evidence of ownership.  Even though plaintiffs have submitted affidavits in their reply to satisfy their burden, the court declines to address evidence raised for the first time in reply, to which defendants have not had an opportunity to respond.  *See,* Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1139 n. 13 (10th Cir. 2003) (when new evidentiary material or new legal argument is presented in a reply brief, district court must either disregard the material or argument or allow the opposing party to file a surreply).  Because plaintiffs have not presented evidence showing that they are current owners or current beneficial holders of any of the B Bonds, the court finds that plaintiffs have not shown that they are entitled to judgment as a matter of law and therefore finds that plaintiffs' motion should be denied.[7]

As to Mr. Card, the court declines to grant defendants' request to engage in discovery.  Mr. Card is only an authenticating witness.  Defendants are not prejudiced

_____

[7] As the first order or business at the trial of this case, the court will expect plaintiffs to offer evidence sufficient to support a finding by the jury that they are B Bondholders.  In the absence of that evidence, the trial will likely end very soon after it starts.  *See,* Rule 50 (a)(1), Fed.R.Civ.P. (permitting entry of judgment as a matter of law as to a dispositive issue once a party has been fully heard on that issue).

by his authentication of documents for purposes of the present motion. There is no reason to permit additional discovery as to Mr. Card.[8]

IV. <u>Defendants' Motion for Summary Judgment</u>

In their motion, defendants seek summary judgment based upon four points. These points are as follows:

A.  The breach of contract claims relating to B Bonds with Stated Maturities on and prior to June 1, 2001 are time-barred;

B.  The claims of class member, Stephens Property Company, for alter ego liability against UBS are barred by the doctrine of *res judicata*;

C.  Class members who purchased B Bonds after Reading & Bates' default on the lease and the Trustee's declaration of default and acceleration of the B Bonds have no claim of alter ego liability against UBS; and

D.  No genuine issue of material fact exists as to any violation of Section 11 of the Securities Act of 1933 or policies relating to Section 11 for purposes of alter ego liability.

A.  <u>Timeliness of Certain Breach of Contract Claims</u>

The parties do not dispute that the applicable statute of limitations for plaintiffs' breach of contract claims is five years as set forth in 12 O.S. 2011 § 95(A)(1). The first four tranches of B Bonds matured on December 1, 1999, June 1, 2000, December 1, 2000 and June 1, 2001. This class action was originally commenced by

---

[8] If, as defendants assert, Mr. Card has not appeared on any of plaintiffs' witness lists, defendants may take it for granted that he will not, absent truly extraordinary circumstances (not apparent here) be a witness in plaintiffs' case in chief at trial.

plaintiff, Michael A. Brady, on May 31, 2006.  *See*, Case No. 06-CV-282-F, Complaint (doc. no. 1).  That action, referred to as Brady I, was dismissed by this court on March 12, 2010 for lack of subject matter jurisdiction.  Specifically, the amount in controversy for the exercise of diversity jurisdiction was not met. Judgment was entered that same day. *Id*. (doc. nos. 119, 120).  Plaintiff timely filed a motion to alter or amend the court's judgment pursuant to Rule 59(e), Fed. R. Civ. P., and a motion to amend the complaint under Rule 15, Fed. R. Civ. P. *Id*. (doc. no. 121).  The court denied both motions on May 4, 2010.  *Id*. (doc. no. 126).  This action, referred to as Brady II, was filed the next day, May 5, 2010.  *See*, Case No. 10-CV-284-F (doc. no. 1).  The original complaint in Brady II was filed by plaintiffs, Michael A. Brady and Curtis E. Larson.  After defendants filed a motion to dismiss (doc. no. 11), an amended complaint was filed, dropping Mr. Larson and adding Frank C. O'Brien as plaintiff.  *See*, Case No. 10-CV-284-F (doc. no. 25).

Defendants, in their motion, assert that by the time Brady I was filed on May 31, 2006, the statute of limitations had clearly expired with respect to the B Bonds having Stated Maturity dates of December 1, 1999, June 1, 2000 and December 1, 2000.  As to the B Bonds maturing on June 1, 2001, defendants contend that there was only one day left in the statute of limitations period.  While defendants acknowledge this court has previously ruled that the pendency of Brady I tolled the statute of limitations, defendants contend that the limitations period began to run upon Brady I's dismissal.  Because Brady II was not filed until 54 days after Brady I's dismissal, defendants contend that the statute of limitations has likewise expired with respect to the B Bonds maturing on June 1, 2001.  Therefore, defendants argue that they are entitled to summary judgment on plaintiffs' breach of contract claims relating to B Bonds maturing on December 1, 1999, June 1, 2000, December 1, 2000 and June 1, 2001.

Plaintiffs, in response, argue that the statute of limitations governing their breach of contract claims relating to B Bonds, maturing on and prior to June 1, 2001, was legally tolled until December 19, 2001, pursuant to American Pipe & Construction v. Utah, 414 U.S. 538, 554 (1974), Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 353-54 (1983), and their progeny. Under those cases, plaintiffs argue, the commencement of a class action suspends the applicable statute of limitations as to all putative class members until class certification is denied. Plaintiffs also assert that this court found, in In re Farmers Ins. Co., FCRA Litigation, 738 F. Supp. 2d 1180 (W.D. Okla. 2010), that the legal tolling recognized in American Pipe and Crown, Cork & Seal Co. also applies to successive class actions. Plaintiffs state that on March 22, 1996, a class action was commenced against defendants in Tulsa County District Court in Roberson v. PaineWebber Incorporated, Case No. CJ-96-1455. That case, according to plaintiffs, was based upon the 1985 sale of the B Bonds and the wrongdoing alleged in that case was premised on many of the same facts and omissions alleged in Brady I and Brady II. Although the legal theories in the Roberson case were predicated on fraud and negligence rather than contract, plaintiffs argue that identical causes of action are not required for tolling to apply. Plaintiffs thus contend that the Roberson case tolled the statute of limitations for Brady I until class certification was denied. Plaintiffs state that class certification was not denied in the Roberson case until December 19, 2001. Because Brady I was filed well within five years of December 19, 2001, plaintiffs maintain that the claims relating to B Bonds, maturing on or prior to June 1, 2001, are timely.

Plaintiffs have two other arguments in support of their contention that their claims are timely. First, they assert that any applicable statute of limitations that would have expired with the dismissal of Brady I was tolled during the pendency of their timely-filed Rule 59(e) motion. According to plaintiffs, Brady I was not

definitely concluded until the Rule 59(e) motion was denied on May 4, 2010. Brady II was then filed the next day, May 5, 2010. Second, plaintiffs contend that when state law supplies the statute of limitations, as in the instant case, it also supplies the tolling rules. Plaintiffs maintain that under Oklahoma law, specifically 12 O.S. 2011 § 100, they had one year from the dismissal of Brady I to file Brady II.

In reply, defendants argue that the Roberson case did not toll the five-year statute of limitations period because it did not involve the same cause of action as in Brady I and Brady II. The Roberson action, defendants assert, alleged "fraud at the point of sale." Doc. no. 211, at 1. In Brady I and Brady II, plaintiffs assert breach of contract claims for non-payment of the matured B Bonds. However, even if the Roberson claims were similar to the claims in Brady I and Brady II, defendants contend that the pendency of that case cannot toll the statute of limitations for Brady I and Brady II. Defendants argue that American Pipe does not apply to subsequent class actions where the earlier denial of class certification was based upon a defect in the class itself. The Roberson court, defendants point out, denied class certification on the basis that individual reliance issues would be significant and would overwhelm any common issues. In addition, defendants argue that the Rule 59(e) motion did not toll plaintiffs' claims because the court had ruled that it lacked subject matter jurisdiction over the action and plaintiffs cannot claim that there was an innocent mistake for continuing to pursue claims through a Rule 59(e) motion. Defendants contend that the rationale of American Pipe is not served when a plaintiff pursues a futile claim in a court known to lack subject matter jurisdiction solely to buy time. Furthermore, defendants contend that § 100 does not apply because "it does not toll for the purposes of subsequent class actions the claims of the purported class members." Doc. no. 211, at 3.

Upon review, the court concludes that plaintiffs' claims relating to B Bonds maturing on December 1, 1999, June 1, 2000 and December 1, 2000 are time-barred. The <u>American Pipe</u> tolling rule does not apply to "sequential class actions where the earlier denial of certification was based on a Rule 23 defect in the class itself." <u>Yang v. Odom</u>, 392 F.3d 97, 104 (3rd Cir. 2004). The denial of certification in the Roberson case was due to a defect in the class itself. Moreover, the claims asserted in Roberson were different than those asserted in Brady I or Brady II. *See*, <u>Williams v. Boeing Co.</u>, 517 F.3d 1120, 1136 (9th Cir. 2008) ("[T]he tolling rule does not 'leave[ ] a plaintiff free to raise different or peripheral claims following denial of class status,'"quoting <u>Crown, Cork & Seal Co.</u>, 462 U.S. at 354 (Powell, J. concurring)). In the court's view, the class Roberson case did not give defendants prior notice of the breach of contract claims which they brought in Brady I and have now brought in Brady II. Therefore, the court concludes that the applicable five-year statute of limitations for plaintiffs' breach of contract claims relating to B Bonds maturing prior to June 1, 2001 was not tolled by the pendency of the Roberson case.

As to plaintiffs' claims relating to B Bonds maturing on June 1, 2001, the court concludes that those claims are timely. The court has previously concluded that the statute of limitations was tolled while Brady I was pending. *See*, doc. no. 54. Although the court dismissed the action without prejudice on March 12, 2010 and the statute of limitations would have commenced again upon that dismissal, *see*, <u>Culver v. City of Milwaukee</u>, 277 F.3d 908, 914 (7th Cir. 2002), the court concludes that plaintiff's timely-filed motion under Rule 59(e) tolled the statute of limitations until the motion was adjudicated. *See*, <u>Lozano v. Corona</u>, 186 F. Supp. 2d 77, 80 (D.P.R. 2002). The Rule 59(e) motion was denied on May 4, 2010 and Brady II was timely commenced the next day.

The court therefore concludes that defendants' motion should be granted to the extent that it seeks summary judgment on the grounds that the breach of contract claims relating to the B Bonds with Stated Maturity dates of December 1, 1999, June 1, 2000 and December 1, 2000 are time-barred.  The court concludes that defendants' motion should be denied to the extent that it seeks summary judgment determining that the breach of contract claims relating to the B Bonds with a Stated Maturity date of June 1, 2001 are time-barred.

B.  *Res judicata*

Stephens Property Company ("SPC") is the holder of 24% of outstanding B Bonds and is a purported member of the certified class in this action.  In 1993, the Collateral Indenture Trustee gave notice of acceleration of the B Bonds, due to an event of default.  Pursuant to the notice, the compound accreted value of the B Bonds became due and payable as of December 8, 1993.  In 1997, SPC brought an action in this court, previously referred to as the "Stephens litigation," against GSW and PWI, now UBS, seeking to recover the sum of $11,769,551.00, which represented the compound accreted value of SPC's B Bonds as of December 8, 1993.  SPC sought enforcement of the obligations against PWI on the basis of alter ego liability.  The case was assigned to the Honorable Michael Burrage.

During the course of the proceedings, GSW and PWI filed a motion for summary judgment.  As previously stated, Judge Burrage issued an order granting defendants' motion.  Judge Burrage initially concluded that SPC's action against GSW was barred by Section 9.11 of the Indenture, the "No Action" clause, and that SPC's claim to hold PWI secondarily liable under the alter ego theory was similarly barred.  Judge Burrage also concluded, however, that even if SPC's claim against PWI were not barred by the "No Action" clause, summary judgment was appropriate as to

23

the "claim" of alter ego liability.  He found that "SPC ha[d] failed to present sufficient evidence to raise a genuine issue of fact as to the presence of an 'overall element of injustice or unfairness.'" *See*, Ex. 2, Turner Affidavit ("Turner Affidavit") in Support of Defendants' Motion for Summary Judgment, p. 13.  SPC did not appeal Judge Burrage's order.

According to defendants, the issue of alter ego liability was fully litigated and adjudicated as to SPC in the Stephens case.  Defendants therefore argue that SPC is precluded by the doctrine of *res judicata* from litigating the issue of alter ego liability in this action.  Consequently, defendants request judgment in favor of UBS as to SPC's breach of contract claims.

Plaintiffs, in response, argue that SPC's claims are not barred by the doctrine of *res judicata*.  Initially, plaintiffs assert that the *res judicata* doctrine encompasses both issue preclusion and claim preclusion.  Because the alter ego theory of liability constitutes an issue rather than a claim, plaintiffs maintain that only issue preclusion applies.  Plaintiffs contend that issue preclusion does not preclude consideration of the alter ego issue in this case for two reasons.  First, plaintiffs argue that the alter ego issue decided by Judge Burrage was not necessary to the judgment in the Stephens action.  According to plaintiffs, Judge Burrage initially ruled that  SPC's claim under Section 9.02 of the Indenture was barred based upon SPC's failure to comply with the "No Action" clause.  Plaintiffs maintain that SPC's claim was cut off at its root and the case was over at that point.  Plaintiffs assert that the remainder of Judge Burrage's decision discussing *alter ego* was unnecessary and was nothing more than *obiter dicta*.  Second, plaintiffs argue that the alter ego issue in the Stephens action is not identical to the alter ego issue presented in this case.  According to plaintiffs, SPC's breach of contract claim in this case is not predicated on the acceleration of the B Bonds but upon the unconditional right to recover on the matured B Bonds.  In

24

addition, plaintiffs assert that the alter ego theory of liability pleaded by plaintiffs to hold UBS liable on the matured B Bonds is different from that pleaded in the Stephens case.

Defendants, in reply, argue that the fact that the breach of contract claim in the Stephens case was different from that asserted in this case is irrelevant. Defendants assert that they seek issue preclusion on the alter ego issue, not the contract claim. According to defendants, the alter ego theory of liability in the Stephens case was the same as presented in this case. Defendants contend that the addition of a few new alleged omissions should not prevent the application of issue preclusion. If so permitted, defendants contend that plaintiffs could bring endless lawsuits simply adding new omissions to a complaint. In addition, defendants contend that plaintiffs' *dicta* argument is wrong. Defendants assert that the alter ego ruling constitutes an alternative holding in support of summary judgment. Because it was an alternative holding, defendants contend that it cannot be relegated to the category of *obiter dictum*. Hence, defendants argue that issue preclusion applies and SPC's claims against UBS are accordingly barred.

The sole issue is whether, as a matter of law, issue preclusion, also known as collateral estoppel, bars SPC's relitigation of the alter ego theory of liability in this case. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980). Because the court in Stephens was exercising diversity jurisdiction, it is unclear whether issue preclusion should be evaluated under federal or Oklahoma state law. The Supreme Court has held that the claim-preclusive effect of a federal diversity judgment is a matter of federal law, but that the federal law is determined by applying "the law that would be applied by state courts in the State in

which the federal diversity court sits." Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 507-508 (2001). In the case at bar, the issue is one of issue preclusion rather than claim preclusion, and therefore, the Supreme Court's holding does not definitively resolve this issue. Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1207 (10th Cir. 2001) (recognizing the distinction and declining to decide whether collateral estoppel should be evaluated using state or federal law when the court in the initial case exercised diversity jurisdiction). The court need not decide, however, the issue as it appears that Oklahoma law and federal law on issue preclusion are the same. Robinson v. Volkswagenwerk AG, 56 F.3d 1268, 1273 n. 3 (10th Cir. 1995).

Issue preclusion "attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" Arizona v. California, 530 U.S. 392, 414 (2000); see also, State ex rel. Dep't of Transportation v. Little, 100 P.3d 707, 719 n. 47 (Okla. 2004) ("Issue preclusion prevents relitigation of facts and issues actually litigated and necessarily determined in an earlier proceeding between same parties or their privies."). The elements of issue preclusion are well-settled. Issue preclusion requires that (1) the issue previously decided is identical with the one presented in the instant action, (2) the prior action was finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party in the prior action, and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue. See, Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000).

The court agrees with defendants that Judge Burrage's ruling on the alter ego issue was an alternative holding rather than *obiter dictum* as argued by plaintiffs. Nonetheless, as stated, issue preclusion applies only to an issue which is essential to the judgment or has been necessarily determined. The Second Restatement of

26

Judgments states that "[i]f a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." Restatement (Second) of Judgments § 27 cmt. i. The Tenth Circuit has declined to give preclusive effect to alternative findings that were each independently sufficient to support a judgment. *See*, Turney v. O'Toole, 898 F.2d 1470, 1472 n. 1 (10th Cir. 1990) (following Restatement § 27 cmt. i and holding that because either of the reasons relied upon by the state court in granting habeas corpus to release the plaintiff from a mental hospital would have been a sufficient ground for granting the writ, "it cannot be said that either issue was actually and necessarily decided . . . . [t]herefore, the writ has no preclusive effect."). Although the Oklahoma Supreme Court has not yet adopted the viewpoint of comment i of section 27 of the Second Restatement of Judgments in any of its decisions, the court notes that the Court has expressly stated that "[a]n issue is necessarily determined if the judgment would not have been rendered but for the determination of that issue." Nealis v. Baird, 996 P.2d 438, 458 (Okla. 1999). Moreover, "[t]he Oklahoma Supreme Court has drawn freely from the Restatement (Second) of Judgments on questions of res judicata." Independent School Dist. No. 1 of Oklahoma County v. Scott, 15 P.3d 1244, 1247 n. 4 (Okla. Ct. App. 2000).

In the Stephens litigation, summary judgment would have been rendered even if Judge Burrage had not decided the alter ego issue. The decision finding that SPC failed to comply with the "No Action" clause was sufficient, standing alone, to support a summary judgment. Because either of Judge Burrage's findings – SPC failed to comply with the requirements of the "No Action" clause or SPC failed to present sufficient evidence to raise a genuine issue of fact as to the presence of an "overall element of injustice or unfairness" – would have been a sufficient ground for

the entry of summary judgment, the court concludes that neither of the two sets of issues was "actually and necessarily decided" within the meaning of Restatement § 27 cmt. i as applied in <u>Turney</u>.  Consequently, the court finds that the doctrine of issue preclusion does not bar the relitigation of the alter ego issue in the case at bar. Defendants' motion will be denied to the extent that it seeks summary judgment as to SPC's claims on the basis that they are barred under the doctrine of *res judicata*.

### C.  Effect of Purchase of B Bonds after Trustee's Declaration of Default and Acceleration on Pursuit of  Alter Ego Liability against UBS

Defendants posit that in seeking to pierce GSW's corporate veil, plaintiffs pursue an equitable remedy.  To invoke this remedy, defendants argue, plaintiffs must demonstrate that they have suffered injury, inequity or injustice.  Defendants, however, argue that the class members who purchased their B Bonds after R& B's default and after the Trustee's declaration of default and acceleration of the B Bonds cannot show any injury, inequity or injustice.  According to defendants, plaintiffs' alter ego theory against UBS is based upon alleged omissions in the 1985 offering documents relating to the value of the B Bonds, the Tulsa real estate market, the financial prospects of R&B and the risk of loss.  Defendants assert that class members who purchased B Bonds long after they were issued, with knowledge of the downturn in the oil and gas market, the decline in the Tulsa real estate market, the financial misfortunes of R&B and the commencement of foreclosure proceedings cannot show any fraud, injustice or inequity based upon the alleged omissions.  Defendants maintain that these class members were "bottom fishers speculating that contract claims would yield more in foreclosure than the pennies on the dollar they paid for already-defaulted bonds."  *See*, defendants' motion, p. 5.  Defendants contend that these aftermarket purchasers were like SPC in the Stephens action.  Defendants

contend that Judge Burrage found that SPC could not recover from UBS, in part because SPC purchased the B Bonds in 1996 after it knew the facts allegedly omitted from the 1985 offering documents. Defendants argue that the class members who purchased their B Bonds after R&B's default and the acceleration of the B Bonds similarly knew the facts allegedly omitted from the 1985 offering documents. Defendants assert that courts have refused to invoke equity for parties in contract cases, such as this, where the parties knowingly entered into the contractual relationship. In the case of aftermarket purchasers, defendants contend that these purchasers bought the bonds with their eyes wide open, for which reason the court should find these purchasers have no remedy in equity.

Initially, plaintiffs, in response, contend that they are not pursuing an "equitable remedy." According to plaintiffs, the remedy they seek is legal, specifically, payment of the B Bonds. In addition, even if they were seeking an equitable remedy, plaintiffs contend that they do not have the burden to demonstrate that they suffered injury, inequity or injustice. Plaintiffs assert that the cases cited by defendants are distinguishable from this case. Moreover, plaintiffs assert that defendants have not defined who the aftermarket purchasers are, and have offered no undisputed material facts to support their claims as to what the aftermarket purchasers knew. Plaintiffs additionally contend that their claims against UBS involve a public wrong not a personal wrong. The public wrong, plaintiffs point out, is the violation of the public policies supporting Section 11 of the Securities Act of 1933. Plaintiffs contend that under Section 11, the B Bonds should never have been offered pursuant to the Prospectus so that they could eventually get into the hands of aftermarket purchasers as well as original purchasers. Plaintiffs also assert that none of defendants' cases, addressing arms-length negotiations of business contracts, support summary judgment against the aftermarket purchasers. Further, plaintiffs maintain that two years after

29

Judge Burrage's decision in the Stephens case, the Tenth Circuit held, in <u>Joseph v.</u> <u>Wiles</u>, 223 F.3d 1155 (10th Cir. 2000), that any person acquiring a security that can be directly traced to the registration statement may bring an action for losses caused by defects in the registration statement.  Therefore, plaintiffs contend that defendants are not entitled to summary judgment as to the claims against UBS by aftermarket purchasers.

In reply, defendants contend that plaintiffs are not asserting a Section 11 claim because that claim is barred, rather they are seeking to impose alter ego liability based upon Section 11 as an equitable remedy. Defendants thus contend that they must show inequity, injustice or fraud as to the aftermarket purchasers.  Defendants maintain that the B Bonds defaulted because of R & B's financial reverses resulting from the catastrophic decline in oil prices.   Therefore, defendants contend that any B bondholder who purchased after the default by R&B, like SPC, cannot satisfy the equitable elements of alter ego liability.  In addition, defendants assert that the question of whether plaintiffs knew about the alleged omissions in the Prospectus is irrelevant to the question of equity.  Defendants contend that plaintiffs have produced no evidence that they relied on the Prospectus or that any alleged omission caused the decline in the value of the B Bonds.  Without evidence of either, defendants argue that there can be no inequity or injustice to the aftermarket purchasers.

Upon review, the court rejects defendants' arguments.  Defendants seek a determination, as a matter of law, that none of the aftermarket purchasers may recover against UBS under an alter ego theory of liability.  But defendants have not identified any aftermarket purchaser other than SPC in their papers.  And it does not appear that defendants seek a specific finding in regard to SPC in this prong of their motion.  In addition, defendants have not provided any facts with respect to any particular aftermarket purchaser's knowledge about the default of R&B, the acceleration of the

B Bonds or any other post-default events.   They simply argue that "[a]ny B Bondholder who purchased *after* the default of R&B, like Stephens, suffered no inequity – they were post-default bottom fishers buying distressed debt – and cannot satisfy the equitable elements of *alter ego* liability."  Doc. no. 211, at 5.  However, defendants have presented no evidence to support their argument.  They merely rely on Judge Burrage's opinion and suggest that his reasoning applies to all aftermarket purchasers.[9]  Defendants have failed to demonstrate that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law as to the aftermarket purchasers' right to proceed against UBS on an alter ego theory of liability.  *See*, Rule 56(a), Fed. R. Civ. P.  Therefore, the court finds that defendants' motion as to the aftermarket purchasers' alter ego theory of liability against UBS should be denied.

   D.   <u>Genuine Issue of Material Fact as to Violation of Section 11 or its Underlying Policies</u>

   Plaintiffs' alter ego theory of liability is premised upon a violation of the "policies" of Section 11 of the Securities Act of 1933.  "Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC."  <u>In re Morgan Stanley Information Fund Securities Litigation</u>,

---

   [9]  The court notes that Judge Burrage found the following facts undisputed:

> At the time SPC purchased its Bonds, it was aware of the terms of the Prospectus and of all other documents and facts alleged in the Complaint.  By no later than December 1994, SPC also knew the Bonds were in default and of the Trustee's foreclosure action on the Mortgage securing the Bonds.

Ex. 2, Turner Affidavit, p. 5.

592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)).  Plaintiffs allege that the Prospectus, which was a part of the Post-Effective Amendment No. 2 to Form S-11 Registration Statement ("Registration Statement"), omitted twelve different material facts.

Defendants contend that they are entitled to summary judgment on the alter ego theory because plaintiffs have failed to identify any duty on the part of defendants to disclose the allegedly omitted information.  Defendants argue that the omission of information, absent a duty to disclose, cannot provide a basis for liability.  Defendants assert that plaintiffs have specifically relied upon their expert, Joseph Long,[10] to support their claims, but that Mr. Long, in his deposition, could not identify any specific regulation that required disclosure of the information allegedly omitted, nor could he identify any statement in the Prospectus that was rendered misleading by any of the alleged omissions.  According to defendants, Mr. Long testified that plaintiffs' alleged omissions are all premised on belief that a company has a duty to disclose "all material information."   Defendants, however, argue that the law does not require disclosure of "all material information."   Defendants further argue that plaintiffs' allegations of omissions are false and that plaintiffs cannot raise a genuine issue of material fact requiring trial.   Plaintiffs' twelve alleged omissions and the specific arguments relating to them are discussed below.

---

[10]  Mr. Long was the subject of a Daubert motion.  The court denied that motion during the hearing held on January 24, 2013.  *See*, Transcript of Motion Hearing, pp. 26-27.  The court stated that Mr. Long would be permitted to testify as to disclosures that are expressly required by statute or regulation and as to the duty to disclose material information necessary to make the disclosures that were not made misleading.  The court also stated that Mr. Long could give his opinion as to the significance of omitted information to prospective bond purchasers.  *Id*. at pp. 20-21.

(i).   Alleged Failure to Incorporate Changes in the Prospectus that SEC Requested

On March 14, 1985, a draft of the Prospectus was provided to the Securities and Exchange Commission ("SEC").  The SEC made a request for additional information relating to the prior offering of the B Bonds.  PWI's outside counsel provided detail to the SEC, by letter dated March 18, 1985, with respect to the prior offering of the B Bonds.  On March 27, 1985, the SEC dictated a letter over the telephone to outside counsel addressed to GSW commenting on the Prospectus.  The letter stated in pertinent part:

Prospectus Summary General

The subsection that appears in the last paragraph of page 7 should be repositioned to appear immediately before "The Bonds" (page 3) and should be expanded to address briefly the circumstances surrounding the attempted public placement of the Series B Bonds and the impact of same, and should include appropriate cross-reference to more detailed textual discussions. . . .

* * * *

No further review of the filing has been or will be made.  All persons who are by statute responsible for the adequacy and accuracy of the registration statement are urged to be certain that all information required pursuant to the Securities Act of 1933 has been included . . . .

*See*, Ex. 34, Turner Affidavit.

Outside counsel responded by letter dated March 28, 1985 setting forth the changes to the Prospectus in response to the SEC comments.  In the letter, counsel stated:

The subsection captioned "Previous Bond Purchases" has been repositioned from page 7 to appear immediately above the caption "The Bonds" on page 3.  Disclosures with respect to the price at which PaineWebber, as underwriter, purchased the Series B Bonds in the June 1984 offering, as well as the price at which $7,000,000 principal amount

of Series B Bonds were subsequently sold, has been set forth under that caption and in the first paragraph on the cover page.

We believe that these facts, together with the other information set forth on the cover page and under that caption, adequately describe the circumstances of the initial offering and indicate the fact that PaineWebber is now offering the bonds for its own account.

*See*, Ex. 35, Turner Affidavit.

Defendants maintain that the Prospectus went through the customary and normal process with the SEC and that they accommodated all substantive comments of the SEC in the Prospectus.  They assert that the SEC received this and considered any problem to be resolved.

Plaintiffs dispute that the SEC concluded that defendants had complied with its directive.  Plaintiffs point out that the SEC had said in its letter that there would be no further review of the filing.  In addition, they contend that defendants' insertions into the Prospectus fell short of complying with the SEC's comments.  In response, plaintiffs assert that the Prospectus does not disclose the failed 1984 placement effort to institutions or the failure to obtain a surety.  They also assert that the Prospectus also does not provide the "detailed textual discussions" as proposed by the SEC.

The court concludes that defendants are not entitled to summary judgment with respect to the alleged failure to incorporate changes in the Prospectus that the SEC requested.  Section 11 calls for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements.  Item 408 of Regulation C has a similar requirement.  During the relevant time frame, Item 408 provided that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 230.408.  Facts are

34

material if "there [is] a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). In addition, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be "complete and accurate." In re Morgan Stanley Information Fund Securities Litigation, 592 F.3d at 366. The duty to avoid omissions does not arise in the abstract. That duty is triggered, in part, by what *is* said in the registration statement. The factual showing made by the plaintiff suffices to raise a genuine issue as to whether the statements made by defendants were misleading in the absence of disclosure of the facts as to the prior offering of the B Bonds. The court also concludes that plaintiffs have presented sufficient evidence to raise a genuine issue of fact as to the materiality of the undisclosed information. This prong of the defendant's motion is accordingly without merit.

### (ii). The Alleged Failure to Disclose R&B's Business Risks

Defendants contend that the Prospectus dedicates over thirty pages to R&B's financial condition and directs investors to R&B's public filings for further information. Defendants assert that the most recent audited financial information available relating to R&B was provided to investors. According to defendants, none of the information regarding R&B in the Registration Statement was false or misleading. They argue that they had no duty to disclose anything more.

Plaintiffs dispute the facts recited by defendants as to the disclosure with respect to R&B. Plaintiffs also argue that despite the information that was provided in the Prospectus about R&B, the expert report of G. Allen Brooks shows that the information did not adequately portray the risks confronted by R&B. Plaintiffs

contend that the Brooks report shows numerous risks that R&B confronted that went beyond those disclosed in R&B's 10-K, concluding that the information in the 10-K was misleading in that it was incomplete as to the risks R&B faced.   Further, plaintiffs, citing Item 503(c) of SEC Regulation S-K, contend that there was a mandatory duty to disclose the risks R&B confronted because the SEC specifically asked for the risk disclosures.   Doc. no. 184, at 19.

Defendants, in reply, contend that Mr. Brooks is the subject of a Daubert motion (granted in part and denied in part on January 24, 2013), and that, in any event, the Brooks report is not sufficient to establish a duty to disclose.   They assert that the Brooks report simply lists the information not included in the Prospectus.   It does not show why there was a duty to disclose or explain why the omission of the additional risks made any statement in the Prospectus misleading.   Defendants contend that there is no duty to report all risks that R&B confronted.   Defendants further argue that there was no mandatory duty of disclosure because the SEC's letter related to the 1984 prospectus rather than the Prospectus at issue, and it did not state that additional risks were required to be disclosed.   Moreover, defendants contend that Item 503(c) applies to the issuer, GSW, and not R&B.   Defendants assert that the bond offering was backed by assets of the Trust Estate and not R&B's 10-K.   In addition, defendants point out that Item 503(c) requires disclosure only of the most significant risk factors – and that the discussion must be concise.   Defendants maintain that the additional information about R&B cannot be deemed to have made the investment "speculative or risky," and that disclosure of this information, as urged by plaintiffs, would not have been concise.

Upon review, the court concludes that defendants are not entitled to summary judgment as to the alleged failure to disclose R&B's business risks.   During the hearing on the Daubert motions, the court concluded that Mr. Brooks is "qualified

36

within the realm of the offshore drilling business to testify as to what information available but not disclosed in the resale prospectus would have been significant to a prospectus [sic] bond purchaser in light of the information that was disclosed." *See*, Transcript of Daubert Motions Hearing, pp. 127-128.

In the court's view, plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether, in light of what *was* said about R&B, the failure to disclose the risks asserted by the plaintiffs made the statements about R&B misleading. *See*, 15 U.S.C. § 77k(a) (prohibiting the omission of a material fact "necessary to make the statements therein not misleading"); *see also*, 17 C.F.R. § 230.408 ("In addition to the information expressly required to be included in a registration statement, there shall be added such further information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading."). Further, Item 503(c), at the relevant time, required a prospectus to include a discussion of the "principal factors" that make the offering speculative or one of high risk. 17 C.F.R. § 229.503(c) (effective 1984 and 1985); plaintiffs' Ex. 393. Although defendants contend that Item 503(c) only applies to the issuer, the language of Item 503(c) does not appear to limit it to the issuer. Moreover, the SEC, in its letter to GSW regarding the 1984 registration statement, stated that "[a]ny risks or material uncertainties concerning *the bonds* should be described . . . ." *See*, plaintiffs' Ex. 59 (emphasis added). It included risks not limited to the issuer. *Id*. GSW's wagon was firmly hitched to R&B's star. The court concludes that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether the risks confronted by R&B made the B Bond offering one of high risk. The court also concludes that plaintiffs have presented evidence adequate to raise a genuine issue of fact as to the materiality of the undisclosed information. Summary judgment is not appropriate as to this alleged omission.

(iii).   The Alleged Failure to Disclose Rental Rate Per Square Foot and the Annual Rental Rates

Defendants contend that they disclosed all that was required with respect to the R&B lease.  Defendants assert that the Prospectus disclosed the minimum annual rental payments due from R&B under its lease.  Defendants point out that the Prospectus disclosed that the R&B lease had a primary term of 25 years and that during that term, R&B would pay, "as Basic Rent, net rentals under the Lease in installments, in arrears, in amount at least equal . . . to the debt service due of the Mortgage Notes." *See*, Ex. 1, Turner Affidavit, p. 25.  The Prospectus also disclosed the semi-annual payments on the B Bonds and the quarterly payments on the A Bonds for each of the 25 years of the lease term.  According to defendants, Financial Accounting Standards Board Accounting Standards Codification 840-40-50-2(a) (formerly FASB Release #13: Accounting for Leases) required R&B to go no further than to disclose in its financial statements or in notes thereto "future minimum lease payments as of the date of the latest balance sheet presented, in the aggregate and for each of the five succeeding fiscal years." *See*, defendants' motion, p. 14.  Defendants point out that Note (H) of R&B's financial statements discloses R&B's rental obligation for 1985-1989 as well as the total rent for the remaining 20 years, and that Coopers & Lybrand certified that R&B's financial statements presented its financial position "in conformity with generally accepted accounting principles consistently applied." *See*, defendants' motion, p. 14; Ex. 1, Turner Affidavit, p. 81.  In addition, defendants contend that a complete copy of R&B's lease was attached as an exhibit to the Registration Statement.  Defendants therefore contend that they are entitled to summary judgment as to this alleged omission.

Plaintiffs, in response, contend that they dispute the facts as presented by defendants.  In addition, plaintiffs assert that while the Prospectus discloses the

payments on the A Bonds and B Bonds, it does not disclose the rent which included, in 1999-2009, the $61 million deferred installment obligation.  Plaintiffs contend that rent is a mandatory disclosure item.  According to plaintiffs, paragraph 24 of Schedule A to Section 7(a) of the Securities Act, 15 U.S.C. § 77aa, required disclosure of the rent obligation.  Pointing out that the Prospectus explains that the rent payable by R&B in the first five years is insufficient and is backed by a letter of credit, plaintiffs contend that there is a reasonable inference "that the required rental payment after five years was sufficient and no subsidy was needed, i.e. the required rent goes down."  Doc. no. 184, at 21.  Plaintiffs accordingly argue, in substance, that the disclosure of the necessity of a subsidy in the first five years amounted to a teaser and that the whole story of the trajectory of the rent payments should have been disclosed.  Further, plaintiffs contend that Schedule B to the lease, which presents "Basic Rent," does not disclose the rent burden because it does not include all costs and taxes.  "Again, the partial disclosure requires full disclosure."  *Id.*  As to defendants' representation that a complete copy of the R&B lease was included with the Registration Statement, plaintiffs contend that the copy did not disclose the actual rent obligation and that the filed lease was different from the final signed lease.

Defendants, in reply, contend that paragraph 24 of Schedule A only requires disclosure of "dates of and parties to, and the general effect concisely stated of every material contract made, not in the ordinary course of business . . . ." 15 U.S.C. § 77aa.  It does not require, defendants argue, disclosure of each rent payment for a 25 year lease term.  In addition, defendants contend that the disclosure of rent for the first five years does not imply a rent decrease thereafter.  According to defendants, the Prospectus discloses that the rent steadily increases during the first five years from $4,860,000 in 1985 to $10,664,000 in 1989 and then discloses that the rental obligation for the remaining 20 years is $347,517,000.  Simple division, defendants

39

contend, shows a rental obligation of approximately $19 million per year, an obvious increase.

The court concludes that defendants are not entitled to summary judgment as to this alleged omission.  Plaintiffs have submitted evidence sufficient to raise a genuine issue of fact as to whether paragraph 24 of Schedule A required more comprehensive disclosure of the rent obligation over the life of the lease.  Plaintiffs have additionally presented evidence sufficient to raise a genuine issue of material fact as to whether the statements made in the Prospectus regarding rent were misleading.  The court also finds that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to the materiality of the alleged omissions.  In addition, the court notes that when a company provides information, whether voluntarily or not, it has a duty to make that information complete and accurate.  In re Morgan Stanley Information Fund Securities Litigation, 592 F.3d at 366.  The court finds that plaintiffs have submitted facts sufficient to withstand defendants' motion for summary judgment as to these alleged omissions.

      (iv).   Alleged Failure to Disclose the Rent to Be Paid by R&B During the Period When the B Bonds Matured, Including Amounts for Deferred Installment Obligation

Defendants emphasize that the details of R&B's lease, as well as the lease itself, were disclosed.  In addition, defendants point out that the Prospectus disclosed that "[b]etween 1999 and 2014, [Mid-Continent Associates] will be required to pay to a PWI Affiliated Entity a deferred installment obligation with respect to its purchase of the limited partnership interest in the Owner . . . which will be funded out of rental payments."  See, Ex. 1, Turner Affidavit, p. 33.  It also provided that "[t]he net present value (using a 15% discount rate) of such obligation, which will be funded out of

rental payments, is estimated to be approximately $3,100,000." *Id*. According to defendants, investors were familiar with discounting to present value because the B Bonds were zero coupon bonds and were sold to them "at prices ranging from 2.4% to 11.6% of their value at Stated Maturity." *See*, defendants' motion, p. 15. Defendants contend that plaintiffs cannot identify any statute or regulation that creates a duty to disclose anything more or that any statement in the Prospectus was misleading.

Plaintiffs contend that there is no way to understand or appreciate the represented discounted value of the deferred installment obligation because the reasonable investor does not know the amount to which the discount rate is applied or the period of time for discounting. In addition, plaintiffs contend that the deferred installment obligation payable during the years from 1999 to 2009 amounts to $61,831,108, which plaintiffs assert is one-third of the maturity value of the B Bonds. While the deferred installment obligation was to be payable out of R&B rent, that fact, plaintiffs assert, is only disclosed in an isolated segment of the Prospectus under the heading "RELATIONSHIPS AMONG PWI AND ITS AFFILIATES, SOUTHWESTERN AND THE OWNER." Plaintiffs contend that there is no reference to the deferred installment obligation payment under the heading "DESCRIPTION OF THE LEASES" or its subheading, "Amounts Payable Under the Lease; Net Provisions." Plaintiffs maintain that this is deceptive and misleading, giving rise to a duty to disclose under 15 U.S.C. § 77k(a) and 17 C.F.R. § 230.408. Further, plaintiffs contend that there is a mandatory duty to disclose because the deferred installment obligation constitutes rent.

In reply, defendants contend that the Prospectus disclosed the 1985 present value of the deferred installment obligation and that it would be funded from R&B's rental payments.

41

The court concludes that defendants are not entitled to summary judgment on the alleged omission to disclose that the rent to be paid included amounts for the deferred installment obligation.  Plaintiffs have presented evidence sufficient to raise a genuine issue of fact as to whether the statements in the Prospectus were misleading.  Although defendants emphasize that the deferred installment obligation was discussed in the Prospectus, it was discussed in section of the Prospectus entitled "Relationships Among PWI and Its Affiliates, Southwestern and the Owner."  It is not discussed in section entitled "Amounts Payable Under the Lease; Net Provisions."  *See*, Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("A prospectus will violate federal securities laws if it does not disclose 'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly."); *see also*, I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991) ("The federal securities laws require that disclosure in prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment.") (internal quotation omitted).  The court also finds that plaintiffs have presented evidence sufficient to raise a genuine issue as to the materiality of the undisclosed information.  Summary judgment will therefore be denied as to this alleged omission.

(v).  Failure to Disclose the Market Value of the Property

Defendants contend that appraisals are "soft information" which the SEC once banned.  While disclosure is now permitted in certain circumstances, defendants posit that this species of disclosure is discouraged.  In addition, defendants contend that the Tenth Circuit has found appraisal information to be immaterial and not subject to disclosure.  Defendants argue that they provided cautionary language in the

Prospectus that the payment of the B Bonds was dependent on R&B's ability to make rental payments under the lease and that investors should not look to the property as a source of payment for the B Bonds in the event of default.  According to defendants, they had no duty to disclose any further information in regard to market value.

Plaintiffs contend that the market value of property must be disclosed if the effect of exclusion would render a prospectus misleading.  Plaintiffs contend that their expert, Terry Van Tuyl, has opined that some potential investors would confuse cost with market value.  Plaintiffs contend that the $95 million cost figure provided in the Prospectus is misleading given Mr. Tuyl's market value appraisal of $33 million.  Although defendants had a $110 million appraisal dated January 1, 1984, plaintiffs contend that this appraisal was not reliable and R&B recognized the appraisal as questionable.  Plaintiffs also point out that defendants have argued in this case that no appraisal in fact existed, but plaintiffs contend that PWI had a duty to present a (presumably realistic) appraisal to prevent the cost statement from being misleading, asserting that "[d]uring the time in question, UBS, as financial advisor to R&B, was aware of the decline in the oil and gas business internationally and its impact on R&B."  Doc. no. 184, at 24.

In reply, defendants contend that the case cited by plaintiff in support of disclosure of appraisals suggests only that appraisals are not necessarily immaterial where the defendant has made a statement regarding the appraised or market value of the property while it possessed a reliable appraisal that contradicted the disclosed appraisal or value.  Defendants contend that cost, but not market value, was disclosed.  Moreover, defendants contend that the only appraisal that existed at the time was consistent with the disclosed cost of construction.  And defendants dispute the proposition that there is a potential for confusion as between cost of construction and market value.

The court finds that defendants are not entitled to summary judgment on the alleged omission as to market value. Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether the Prospectus was misleading and whether the undisclosed information was material. This case is distinguishable from the Tenth Circuit cases cited by defendants, <u>Connett v. Justus Enterprises, Inc.</u>, 68 F.3d 382 (10th Cir. 1995) and <u>Garcia v. Cordova</u>, 930 F.2d 826 (10th Cir. 1991), wherein the Court found the appraisals immaterial.

A short digression is appropriate here. The court is not prepared to fall in line with a contention that some specific number, presumably far lower than the cost of the project, should actually have been disclosed in the Prospectus. The court elaborated on this point at the hearing on the Daubert motions:

> [T]here is room in this record for a suggestion that this project was conceived and built as a corporate vanity project, if not as a personal vanity project, with some sense that the prime tenant and the developers were relatively indifferent to the overall cost of the project. The result was that a cost was incurred that would never have been supportable with foreseeable market rents and this cost number found its way into the prospectus.

> The problem is that putting the cost of this project in the prospectus carried the implication that rational people had concluded that the property would generate net operating income sufficient to justify that cost.

> * * * *

> Plaintiffs' case is not predicated, in my view, on any particular fair market value and this case is really not about fair market value in the final analysis. This case is about control and disclosure.

> The cost of the building was disclosed in the prospectus. The truly remarkable trajectory of rent payments under the absolute net lease was disclosed in the registration statement, but not in the prospectus. There's an overall number at the end of the prospectus, but that trajectory is not disclosed in the prospectus.

44

An appraised value of the tangible collateral was not included in either the prospectus or the registration statement. Defendants assert that if they had disclosed an appraised value, they would have disclosed the $110 million appraisal they already had, but plaintiffs are entitled to proceed on the basis, first, that an appraised value should have been disclosed in light of the deceptive potential of the disclosure of the cost of the project; and, second, that the appraised value should have been a realistic appraised value; and, third, that a realistic appraised value of the fee interest in the tangible collateral was substantially less than the cost of the project or the amount of the debt against it.

So it may be that the appraisal testimony will not be relevant in the sense that any particular number is necessarily determinative of anything in issue in this case. However, I do conclude that the appraisal testimony may ultimately be relevant, as it may indicate that there was a substantial gap between the amount of the debt and the value of the tangible collateral.

And I have no trouble concluding, by the way, that the value of the tangible collateral is a relevant consideration because obviously one scenario that has to be taken into account in any event is what happens in the event of a default.

I may need to cover these matters with an appropriately drafted limiting instruction and the parties are welcome to propose such an instruction.

Transcript of Motion Hearing, pp. 59, 63 - 64.

There is good reason to be wary of any general proposition that disclosures with respect to asset-based securities must include specific appraised values of the underlying assets. Any such general requirement would likely provide fertile ground for wholly unwarranted litigation. But, in the case at bar, the structure of the financing of the Mid-Continent Tower project arguably removed the project from the realm of conventional commercial real estate deals – so much so that it can plausibly be said that, in light of what *was* disclosed in the Prospectus, the issuer should have been at pains to make it clear, one way or another, that this project rested on

45

foundations far different from those that a prospective bond purchaser would ordinarily expect. It can also plausibly be said, or at least asserted, that the true character of the financing scheme, and the perils that were inherent in it, were not fairly deducible from the Prospectus. The upshot is that appraisal testimony will be admitted, as was determined at the hearing on the Daubert motions. But defendants are certainly welcome to propose a limiting instruction consonant with the foregoing observations.

Bearing in mind that more work needs to be done to shape this issue for trial and submission to the jury, the court concludes that the motion for summary judgment should be denied as to the omission of disclosures as to the market value of the property.

      (vi). <u>Failure to Disclose That Upon Default A Bondholders Could Purchase Property Reducing the Collateral Value of Property for B Bondholders, and for a Period of Time Had Ability to Direct the Trustee</u>

Defendants contend that the relationship between the A and B bondholders was set forth in the Indenture which was incorporated by reference into the Prospectus and publicly available as an exhibit to the Registration Statement. Defendants point out that under the Holders' Rights to Enforcement by Trustee subheading in the Prospectus, it states that "Holders of a majority in aggregate principal amount of outstanding Bonds and any additional Bonds may direct the time, method and place of any proceeding for any remedy available to the Trustee to enforce the provisions of the Indenture (Section 9.16) . . . ." *See*, Ex. 1, Turner Affidavit, p. 22. Defendants contend that no further disclosure was required.

Plaintiffs, in response, assert that the "PROSPECTUS SUMMARY" under "Collateral" states that the "Series A and Series B Bonds are on a parity . . . ." *See*,

Ex. 1, Turner Affidavit, p. 4.  Plaintiffs contend that substantial issues of material fact exist concerning material omissions related to this statement.  According to plaintiffs, difficulties arose under Sections 9.05B and 9.16 of the Indenture when PWI shifted its target market in 1985 on the B Bonds from institutions to holders of IRAs.  Plaintiffs state that the A bondholders were a group of eight institutions, each having the same counsel and acting together to perform due diligence.  Plaintiffs contend that their cohesiveness was decisive.  Plaintiffs assert that the A bondholders acted together to direct the Trustee under Section 9.16 to purchase the Property under Section 9.05B.  They contend that individual holders of IRAs could not have done the same.   Doc. no. 185, at 16, ¶ 75a.  In reply, defendants contend that the Prospectus disclosed that the A bondholders were eight institutional investors and that they had purchased the $82,400,000 of A bonds.  Defendants assert that how the bondholders might choose to exercise their rights subsequent to purchase could not be controlled, predicted or disclosed by defendants.  They contend that they did not have a duty to disclose anything more about these relationships.

The court concludes that defendants are entitled to summary judgment as to this alleged omission.  As stated by defendants, the Indenture was attached as an exhibit to the Registration Statement and was incorporated by reference in the Prospectus.  The Prospectus also stated that the holders of a majority of the principal amount of the outstanding bonds "may direct the time, method and place of any proceeding for any remedy available to the Trustee to enforce the provisions of the Indenture . . . ."  *See*, Ex. 1, Turner Affidavit, p. 22.  The Prospectus also reveals that the A bondholders were eight institutional investors.  Although the Prospectus does not reveal information relating to the cohesive character of the A bondholders (*e.g.,* that they had the same counsel and performed due diligence jointly), the court has no trouble concluding, as a matter of law, that this asserted omission did not make the Prospectus

misleading.  A reasonable investor would recognize that it would be easier for the eight institutional investors holding $82,400,000 of A bonds to agree to direct the Trustee to enforce the provisions of the Indenture.[11]  Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact on the question of whether the omitted information was required to be disclosed.  The court therefore concludes that summary judgment is appropriate as to this component of plaintiffs' claim.

(vii).  Alleged Failure to Disclose That The Lease Was Not Negotiated at Arms-Length

Defendants acknowledge that the R&B lease was not the product of an arms-length transaction.  Defendants contend that the transaction of which the lease was a part was disclosed in the Prospectus as a sale and leaseback method of financing the construction of R&B's world-wide headquarters.  The Prospectus disclosed that rent to be paid by R&B was the source of payment of the B Bonds.  It also disclosed that the amount of financing was dictated by the cost of the project and the rent was dictated by the amount of financing.  Additionally, defendants contend that the Prospectus set forth an estimated project cost of $95,000,000.  Further, defendants contend that the Prospectus stated that the leases had been signed but the final lease payments would be negotiated based upon a determination of the final project cost.  It further disclosed, defendants point out, that the deferred installment obligation

---

[11]  The eight institutional investors who purchased the Series A Bonds included Aetna Life Insurance Company, John Hancock Mutual Life Insurance Company, The Mutual Life Insurance Company of New York, MONY Pension Insurance Corporation, New England Mutual Life Insurance Company, The Variable Annuity Life Insurance Company, Lutheran Brotherhood and United of Omaha Life Insurance Company.

would be funded out of rental payments. Defendants contend the statements in the Prospectus were not misleading.

Plaintiffs, in response, note, correctly, that defendants have admitted that the R&B lease did not result from arms-length negotiations. While defendants state that the Prospectus states that the amount of financing was dictated by the cost of the project and that the rent was dictated by the amount in terms of the financing, plaintiffs argue that the Prospectus does not make such statements. Plaintiffs recognize that the Prospectus discloses the "Basic Rent," but assert that the Prospectus says nothing about an absence of arms-length negotiation. Plaintiffs contend that there is no statement about the deferred installment obligation in the section dealing with amounts payable under the lease. There is also no disclosure, plaintiffs contend, that the deferred installment obligation was added without any negotiation. Further, plaintiffs assert that the statement concerning the final lease payments being negotiated based upon the determination of the final project cost conveys an impression of an arms-length negotiation, but the evidence shows that no such negotiation occurred. Plaintiffs argue that, to keep this statement (as well as the totality of the Prospectus) from being perceived as suggesting that the rent would actually be negotiated, it was necessary to disclose an absence of  arms-length bargaining.

Defendants, in reply, argue that the terms of the financing transaction were carefully negotiated. They maintain that "[t]he lease portion of the sale leaseback transaction was not an arms-length *lease of real estate* as (in any *sale leaseback* transaction) the lease provides the schedule for the repayment of the money advanced." Doc. no. 211, at 13. The deferred installment obligation, defendants argue, was a matter determined at arms-length between R&B and PWI. And the Prospectus, defendants contend, discloses both.

The court concludes that defendants' motion should be denied as to the alleged failure to disclose the absence of arms-length negotiations.  A sophisticated analyst or advisor might have concluded from the Prospectus that the lease probably did not result from arms-length negotiations, but that was far from clear from the Prospectus. There is ample room in this case for a jury to find that the R&B lease was not entered into for the reasons for which corporate tenants typically enter into leases – *viz.*, to get good office space at a market price, with some protection, over time, from radical increases in prevailing office rental rates.  There was nothing wrong with calling the document a lease, and there was nothing wrong with using the lease as one component of the financing structure for this project.  But the record would support a finding that the numbers in the lease were the end point – rather than the market-driven beginning point – of a process in which the total cost of the project was summed up, with the resulting numbers plugged into the lease.  It is at least arguable that that fact is not fairly deducible from the Prospectus,[12] and that fact goes to the essential nature of the project that was financed in part by the B Bonds.  Plaintiffs assert, in essence, that the Prospectus should have contained disclosures that would have forestalled any assumption – which would have been a natural assumption – that the lease transaction could safely be regarded as having been rooted in market-based economic reality. Defendants have failed to demonstrate, as a matter of law, that this contention is

---

[12]   In defendants' opening brief, they say, citing p. 25 of the Prospectus, that "The rent was dictated by the amount and terms of the financing."  Doc. no. 182, at 19.  That certainly appears to be a true statement.  But it is noteworthy that the cited page of the Prospectus really does not say that.  The relevant statement on p. 25 of the Prospectus is that:  "During the Primary Term of the Lease, R&B will pay, as Basic Rent, net rentals under the Lease in installments, in arrears, in amounts at least equal (together with payments described in the next paragraph) to the debt service payments due on the Mortgage Notes."  A natural reading of the quoted language would assure the reader that the rent payments (with the subsidy for the first five years) will cover the payments due under the mortgage.  The quoted language clearly does not tell the reader that the rent was "dictated by the amount and terms of the financing."

without merit.  As to the failure to disclose the fact that the lease did not result from arms-length negotiations, plaintiffs have demonstrated the existence of genuine issues of material fact as to nondisclosure and materiality, and as to the potential to mislead prospective bond purchasers.   The short of the matter is this: Defendants state, concisely, at p. 19 of their opening brief, that: "The R&B transaction was not an arms-length lease of real estate."  Doc. no. 152, at 19.  This was easily enough said in the brief.  The same simple statement could as easily have been included in the Prospectus – which would have helped a reasonable investor to understand the securities being offered.

The court concludes that summary judgment is not appropriate as to this component of plaintiffs' claims.

> (viii).   Alleged Failure to Disclose that the PHC Stock Owned by Perkowski and Bush Automatically Reverted to PWI Upon Leaving Employment, Revealing Control of GSW by PWI

Defendants contend that Prospectus accurately discloses the purpose and structure of GSW as well as the relationship between GSW, PHC Corporation, Perkowski, Bush and UBS.  Defendants contend that PWI did not control GSW.  The Trustee, defendants assert, controlled GSW's assets and business operations.  Further, defendants contend that the omission to disclose that PHC stock reverted to PWI does not render any statement in the Prospectus materially misleading or create a duty to disclose.

In response, plaintiffs contend that there are multiple facts showing PWI's control over GSW and that it used GSW as its instrumentality.  Plaintiffs assert that the reversion of stock to PWI is not a marginal fact.  According to plaintiffs, it brings together the entire web of companies and reveals the control and dominance of PWI.

Plaintiffs contend that disclosure of these facts was required under Item 408 of Regulation S-K.

Defendants, in reply, argue that plaintiffs do not allege or present evidence as to how any of the statements in the Prospectus were rendered misleading by the omission to disclose the reversion of the PHC stock and that they had no duty to disclose the alleged omission.

The court finds that defendants are not entitled to summary judgment as to this alleged omission. Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether the matters that were disclosed as to PHC (and its relationships with other persons and entities) in the Prospectus were misleading, thereby creating a duty of disclosure.

### (ix). Alleged Failure to Disclose Application to Receive a BA1/NR rating on B Bonds and Absence of a Rating

Defendants contend that Rule 10(c) of Regulation S-K allows issuers to disclose ratings on a purely voluntary basis. Defendants point out that, in the case at bar, the Prospectus made no representations about a rating, concluding that, because no representations were made about a rating, an omission regarding the rating cannot render any statement made in the Prospectus misleading.

Plaintiffs contend that because senior management of PWI and GSW knew the expected rating on the B Bonds was not obtained and that a failure to disclose the information would mislead investors, defendants had a duty to disclose the failure to obtain a rating.

Defendants, in reply, argue that a lack of rating meant nothing, a proposition with which the court agrees, at least for the purpose of determining disclosure obligations in the circumstances of this case.

The court concludes, consequently, that defendants are entitled to summary judgment as to the alleged duty to disclose the application to receive a BA1/NR rating on the B Bonds, and the absence of a rating.  Disclosure of ratings, as stated by defendants, is voluntary under Item 10(c) of Regulation S-K.  17 C.F.R. § 229.10(c) ("[T]he Commission permits registrants to disclose, on a voluntary basis, ratings assigned by rating organizations to classes of debt securities, convertible debt securities and preferred stock in registration statements and periodic reports.") Plaintiffs have failed to show that defendants had a duty (either an affirmative duty or a duty triggered by statements that were made in the prospectus) to disclose the omitted information.  Plaintiffs have not demonstrated that any disclosures in the Prospectus were misleading for failure to disclose the facts as to the fate of the rating application and the absence of a rating.  Consequently, summary judgment is appropriate as the alleged omission regarding rating of B Bonds.[13]

### (x).   Alleged Failure to Disclose the Fees that PaineWebber Would Receive From the Sale of the B Bonds

Defendants argue that Shearson Lehman Brothers, Inc., not UBS, served as the qualified independent underwriter for the offering and sale of the B Bonds.  In addition, defendants assert that the underwriting discounts and commissions paid in connection with the offering and sale of the B Bonds were paid by PWI, not R&B, and

---

[13]   It should be borne in mind that the court's rulings as to this series of alleged omissions are not evidentiary rulings.  The summary judgment rulings in this order (for instance, granting summary judgment in favor of the defendants as to the existence of a duty to disclose the denial of the requested rating) are substantive rulings under Rule 56, as sought by the defendants (*see*, doc. no. 152, at 9 - 11, 21), and do not determine, for instance, whether the fact of the denial of the rating is admissible in evidence.  If that fact is admissible (and it may well be), it may be appropriate to give the jury a limiting instruction, if an appropriate, non-argumentative limiting  instruction is timely requested by defendants.

the expenses of the offering were paid by the underwriters, not R&B. Defendants further contend that the Prospectus disclosed all fees and commissions that PWI had received and anticipated in receiving pursuant to the 1984 issuance and sale of the B Bonds. Therefore, in light of these facts, defendants argue that they had no duty to disclose any other information in the Prospectus.

Plaintiffs contend that Item 508(e) of Regulation S-K requires underwriting compensation to be disclosed. A failure to disclose all compensation, plaintiffs argue, is a material omission.

Defendants, in reply, assert that while plaintiffs cite regulations requiring disclosure of fees, they do not identify any fees that were not disclosed.

The court concludes that defendants are entitled to summary judgment as to this alleged failure to disclose. Defendants have established that the Prospectus disclosed the fees received and anticipated by PWI in connection with the offering and sale of the B Bonds. Plaintiffs have failed to present evidence sufficient to raise a genuine issue of material fact as to whether defendants failed to disclose all compensation as required by Item 508(e). Plaintiffs have also failed to submit evidence raising a genuine issue of material fact as to whether the statements in the Prospectus about fees were misleading.

(xi). <u>Alleged Failure to Disclose that PaineWebber Had An Investment Banking Relationship With R&B Beyond R&B Transaction</u>

Defendants contend that the R&B transaction was the first time that PWI was engaged to provide any investment banking services for R&B. Defendants acknowledge, however, in the spring of 1985, R&B engaged PWI to provide services in connection with a single offshore drilling rig. Payment for those services, defendants assert, was made after the sale of B Bonds to plaintiffs. Defendants argue

that there was no duty to disclose this transaction in the Prospectus and that summary judgment is appropriate on this issue.

Plaintiffs, in response, contend that whether an investor would have found it material that PWI as issuer and underwriter had an investment banking relationship with the R&B transaction is a jury question.  Plaintiffs assert that courts have suggested that disclosure is required in the case of a potential conflict of interest.

In reply, defendants argue that R&B's subsequent engagement of PWI for another investment banking transaction did not amount to a conflict of interest. Defendants contend that plaintiffs have offered no evidence as to how PWI's interest in the rig transaction conflicted with any interests in the subject transaction or why it would be material to an investor's risk evaluation of the B Bonds.

The court concludes that defendants are entitled to summary judgment as to this alleged omission.  Plaintiffs have failed to establish that R&B's engagement of PWI for another investment banking transaction was a matter that was required to be disclosed.  Moreover, plaintiffs have not presented sufficient evidence to raise a genuine issue of material fact as to whether the alleged omission had to be disclosed in order to prevent the Prospectus from being misleading.  The cases cited by plaintiffs, Jenny v. Shearson, Hammill & Co., Inc., 1978 WL 1115 (S.D.N.Y. Oct. 6, 1978), and In re WorldCom, Inc., Securities Litigation, 219 F.R.D. 267, 277 (S.D.N.Y. 2003), are distinguishable.

(xii).  Alleged Failure to Disclose that PaineWebber Omitted to Follow
         its Own Underwriting Guidelines

Defendants contend that they are entitled to summary judgment as to this alleged omission in that plaintiffs have never identified any underwriting guidelines that PWI did not follow.  In addition, defendants point out that Shearson Lehman

Brothers Inc. ("Shearson Lehman") was the qualified independent underwriter for the offering and sale of the B Bonds.  Defendants contend that the Prospectus disclosed the status of Shearson Lehman and that copies of the agreements by which Shearson Lehman acted as the qualified independent underwriter were publicly available.

Plaintiffs, in response, assert that the Prospectus discloses that PWI was also acting as an underwriter.  According to plaintiffs, PWI did not fulfill its duties as co-underwriter because it did not conduct a due diligence investigation.  In addition, plaintiffs contend that PWI did not reveal its actual and potential conflicts of interest.  Plaintiffs maintain that a conflict of interest existed, particularly with respect to PWI's role as seller and underwriter.

In reply, defendants contend that no regulation requires an underwriter to disclose the due diligence conducted and that plaintiffs have not identified any statement that was rendered misleading by the alleged failure of PWI to conduct due diligence.  (They also argue that due diligence was conducted.)  As to the conflict of interest issue, defendants contend that PWI's role as a seller and underwriter was disclosed in the Prospectus.

The court finds that defendants are entitled to summary judgment as to this alleged omission.  Plaintiffs have not identified in their papers a statute or regulation requiring disclosure of the alleged failure to conduct due diligence.  They have made no showing sufficient to raise a genuine issue of fact that any of the statements in the Prospectus are misleading in this respect.

As to the alleged failure to reveal a conflict of interest, plaintiffs cite In re WorldCom, Inc. Sec. Litigation, 346 F. Supp. 2d 628, 689 (S.D.N.Y. 2004), wherein the court relied upon Item 408 of Regulation S-K to support disclosure of a material omission.  However, plaintiffs have not presented facts sufficient to raise a genuine

issue as to whether a disclosure obligation was triggered under Item 408. Moreover, the Prospectus revealed PWI's dual roles as seller and underwriter.

In sum, the court concludes that defendants are entitled to summary judgment as to five of the alleged omissions. These omissions relate to A Bondholders' ability to purchase Property and direct Trustee (discussed in section vi), application to receive a BA1/NR rating (discussed in section ix), fees (discussed in section x), investment banking relationship with R&B (discussed in section xi) and PWI's own underwriting guidelines (discussed in section xii). The court concludes that defendants are not entitled to summary judgment as to the remaining seven omissions. These omissions relate to earlier efforts to sell B Bonds (discussed in section i), business risks of R&B (discussed in section ii), rental rates (discussed in section iii), deferred installment obligation (discussed in section iv), market value (discussed in section v), absence of arms-length transaction (discussed in section vii) and PHC stock reverting to PWI (discussed in section viii).

## V. Defendant UBS' Motion for Summary Judgment

UBS was neither an issuer of, nor an obligor on, the B Bonds. Nevertheless, plaintiffs, in their amended complaint, seek to hold UBS liable for payment of the matured B Bonds based upon theories of instrumentality liability, alter ego liability and agency liability. *See*, Amended Complaint, (doc. no. 25), ¶¶ 61-72. According to plaintiffs, the "fraud," "unfairness" or "injustice" components of their theories of liability are met by the omissions (discussed above) in the Registration Statement and the Prospectus therein, in violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. UBS seeks summary judgment as to each of the theories of liability asserted by plaintiffs.

A.  <u>The Agency Theory</u>

At the outset, UBS argues that plaintiffs' agency theory of liability is precluded by the express terms of the Indenture, which was publicly filed and available to all investors as an exhibit to the Registration Statement.  UBS contends that Section 8.03 of the Indenture specifically provides that "no recourse shall be had for the payment of the principal of or interest . . . on the Bonds . . . by any other person other than [GSW] on the ground . . . [GSW] was acting as an agent for . . . such person and that such person was the principal of [GSW] . . . ."  Ex. 11, Turner Affidavit.  UBS contends that Section 8.03 could not be any clearer in precluding plaintiffs' attempt to hold UBS liable on the theory that GSW was acting as "agent" of UBS in connection with the issuance, offering or sale of B Bonds.

Plaintiffs counter that UBS cannot escape liability under the agency theory of liability by arguing that Section 8.03 disclaims an agency relationship.  Plaintiffs argue that cases addressing the issue have held the disclaimer of agency to be insufficient as a matter of law.  Plaintiffs assert that an agency relationship may be found where one corporation directed and controlled another in the accomplishment of a wrongful act, and they argue that agency liability does not require a finding of total domination or the existence of the general alter ego criteria.  Plaintiffs contend that the evidence in the record presents an issue of fact for the jury as to whether an agency relationship existed between GSW and UBS.

In reply, UBS argues that plaintiffs have not presented any proof of "actual authority" which UBS expressly or implicitly granted to GSW.  Moreover, UBS contends that Section 8.03 provides in explicit terms that UBS did not grant GSW authority to act as its agent.  Thus, UBS maintains that plaintiffs have failed to raise a triable issue as to liability based upon an agency theory.

58

The court concludes that UBS is not entitled to summary judgment on the agency theory of liability.  In support of their agency theory, plaintiffs rely, in part, on Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466 (3d Cir. 1988).  The Third Circuit in that case described the agency theory as follows:

> There is a second theory under which a parent may be held liable for the activities of its subsidiary: an application of general agency principles.  One corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company. However, one corporation – completely independent of a second corporation – may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. *See* Restatement (Second) of Agency § 14M, comment (a) (1958). Under this second theory, total domination or general alter ego criteria need not be proven.
>
> When one corporation acts as the agent of a disclosed principal corporation, the latter corporation may be liable on contracts made by the agent. *See* Restatement (Second) of Agency § 144 (1958).  Liability may attach to the principal corporation even though it is not a party named in the agreement. *See* Restatement (Second) of Agency §§ 147, 149 (1958).  *See also* W. Seavey, *Handbook of the Law of Agency* § 70 (1964); W.E. Sell, *Agency* § 103 (1975).
>
> Unlike the alter ego/piercing the corporate veil theory, when customary agency is alleged the proponent must demonstrate a relationship between the corporations and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the

59

> arrangement must be relevant to the plaintiff's claim of wrongdoing.

*Id*. at 1477 (footnote omitted).

In addition, the court in <u>Mobil Oil Corporation v. Linear Films Inc.</u>, *supra,* addressing the agency theory, had this to say:

> A vital prerequisite to imposing liability based upon customary agency principles is finding a close connection between the relationship of the two corporations and the cause of action . . . On the facts of the instant case, the relevant question is whether the alleged principal . . . directed the specific actions of the alleged agent . . . which resulted [in the injury alleged].

718 F. Supp. at 271-72.

Although total domination need not be shown (and, likewise, the alter ego criteria need not be satisfied) as a prerequisite to agency liability, plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether UBS, in fact, exercised complete dominion or control over GSW in the B Bond transaction. They have presented evidence sufficient to raise a question of fact as to whether UBS directed the specific actions of GSW with respect to this transaction.

As acknowledged by UBS, in its reply, Delaware courts recognize agency liability based upon actual authority and apparent authority. *See*, <u>Albert v. Alex Brown Mgmt. Serv.</u>, 2005 WL 2130607 *10 (Del. Ch. 2005). In the instant case, as stated by UBS, plaintiffs appear to be relying upon actual authority rather than apparent authority in support of their agency liability theory. Actual authority is the "authority which a principal expressly or implicitly grants to an agent." *Id*. Contrary to UBS's arguments, however, the court finds that plaintiffs have presented evidence sufficient to raise a genuine issue of material fact as to whether UBS expressly or

60

implicitly granted GSW authority in relation to the issuance of the B Bonds.  As the evidence in the record reveals, taken in a light most favorable to plaintiffs, UBS controlled GSW from its formation.  Because UBS controlled GSW, a reasonable juror could conclude that it expressly or implicitly granted GSW authority to act on its behalf in regard to the B Bonds.  A reasonable juror could also conclude that the arrangement between UBS and GSW was relevant to the factual circumstances giving rise to plaintiffs' claim for breach of contract.

The court rejects UBS's argument that Section 8.03 of the Indenture precludes a finding that GSW was acting on behalf of UBS.  Section 8.03 does not provide an express disclaimer of an agency relationship between GSW and UBS in regard to the subject transaction.  It simply precludes a contract-based claim on the bonds against an entity other than GSW on the grounds that the party is the principal of GSW.  The claim against UBS is not contractual, and the court does not intend to submit to the jury a contract claim against UBS.  *See*, Mabon, Nugent & Co. v. Texas American Energy Corp., 1988 WL 5492 *3 (Del. Ch. Jan. 27, 1988) (restrictive indenture provisions, such as the no recourse clause, apply to claims for breach of contract).  Therefore, the court concludes that UBS is not entitled to summary judgment on the agency liability theory.

B. The Alter Ego Theory

A plaintiff seeking to disregard the corporate veil, such as in the instant case, faces a "difficult task."  Harco, 1989 WL 110537 at *4.  Nonetheless, in appropriate circumstances, the corporate veil may be pierced.  *Id*.; *see also*, Pauley, 239 A.2d at 633 (upon proper showing corporate entities may be disregarded).  Delaware law permits the corporate veil to be pierced "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable

consideration among members of the corporation required it, are involved." *Id*. Additionally, the corporate veil may be pierced in cases where a corporation is in fact a mere instrumentality or alter ego of another corporation.  <u>Mabon v. Nugent & Co. v. Texas American Energy Corp.</u>, 1990 WL 44267, at *5 (Del. Ch. April 12, 1990) (citing <u>Harco,</u> 1989 WL 110537, at **4-6).

In <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451 (2d Cir. 1995), the Second Circuit, applying Delaware law, set forth a two-pronged test for alter ego liability, focusing on (1) whether the corporate entities "operated as a single economic entity," and (2) whether there was an "overall element of injustice or unfairness." *Id*. at 1457. Among the factors to be considered in determining whether the corporate entities operated as a "single economic entity" are:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Id*. at 1458 (quoting <u>Harco</u>, 1989 WL 110537, at *4, quoting <u>Golden Acres, Inc.</u>, 702 F.Supp. at 1104).  None of these factors are, by themselves, sufficient to "justify a decision to disregard the corporate entity." <u>Harco</u>, 1989 WL 110537 *5 (quoting <u>Golden Acres</u>, 702 F. Supp. at 1104).  Instead, "some combination of them [is] required," and "an overall element of injustice or unfairness must always be present, as well." *Id*.

The Second Circuit, applying Delaware law, in <u>Netjets Aviation, Inc. v LHC Communications, LLC</u>, 537 F.3d 168, 177 (2d Cir. 2008), further discussed the alter ego analysis:

Stated generally, the inquiry initially focuses on whether "those in control of a corporation" did not "treat[ ] the corporation as a distinct entity"; and, if they did not, the court then seeks "to evaluate specific facts with a standard of 'fraud' or 'misuse' or some other general term of reproach in mind," [Irwin v. Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 989 (Del. Ch. 1987)], such as whether the corporation was used to engage in conduct that was "inequitable," Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 269 (D. Del. 1989) . . . or "prohibited," David v. Mast, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999), or an "unfair trade practice," *id.*, or "illegal," Martin [v. D B. Martin, 88 A. 612, 615 (1913)].

*Id.* at 177.

(i).  Single Economic Entity

With respect to the first prong of the alter ego analysis, the court concludes that plaintiffs have adduced evidence, taken in a light most favorable to them, sufficient to raise a genuine issue of fact as to whether GSW and UBS operated as a single economic entity.  In the subject R&B transaction and the sale of the B Bonds in 1985, UBS was represented by Jack Perkowski and William Bush.  Perkowski was in charge of the real estate group and he and Mr. Bush were Managing Directors of UBS.  *See,* plaintiffs' statement of disputed and undisputed facts ("PF), 3c.  Perkowski had stated in September 1983 that "UBS had complete control over the manner in which the deal was marketed. . . ." *Id.*  UBS determined that it was necessary for a corporation to be created for the issuance of the public debt.  PF 16a.  GSW was formed in October of 1983.  Perkowski and Bush were named its directors.  Perkowski became President and Bush became Vice President.  Christopher Moriarty, another UBS employee, was Treasurer and Alexander Jordan, outside counsel for UBS, was Assistant Secretary.  UBS kept some books and records for GSW.  The company never had any paid

63

employees or an office separate from UBS.  UBS's law firm represented GSW and UBS paid  GSW's expenses.  PF 16b.  PHC Corporation held the 1,000 shares of outstanding common stock of GSW.  The consideration for the stock was only $1,000.  PHC Corporation also had 1,000 shares of stock, of which 500 shares were owned by Perkowski and 500 shares were owned by  Bush.  However, Perkowski and Bush's ownership of stock in PHC Corporation was contingent upon their remaining employees of UBS.  PF 16b, 16d.  In addition, UBS stated in the Keep Well Agreement dated June 1, 1984 that it had "caused [GSW] . . . to be formed and [UBS], its affiliates and employees control [GSW] . . . ."  Perkowski signed the agreement for each party, except the Trustee.  PF 16f.

The 1985 sale of the B Bonds through the Prospectus was premised on GSW's execution of the Post Effective Amendment No. 2 to the Registration Statement.  Perkowski and Bush caused GSW to execute the document, which contained the Prospectus, on March 30, 1985.  The Indenture prohibited GSW from doing any business other than that arising out of the ownership of the Trust Estate.  UBS also caused GSW to execute an Indemnification Agreement on April 1, 1985, which indemnified both UBS and Shearson Lehman.  There was no business or legal reason to execute the Indemnification Agreement and GSW promised in the Indenture not to guarantee any obligations.  PF 57b.  There is also a dispute as to whether GSW had an obligation to sign the Registration Statement.  PF 57c.  GSW also executed the Underwriting Agreement.  PF 33a.  The Indenture Trustee was neither consulted nor approved GSW's actions.  PF 23a.  GSW did not hire counsel to perform due diligence on the 1985 offering of the B Bonds.  PF 57e.

Although not all of the relevant factors are met here (corporate records have been kept, corporate formalities between GSW and PHC have been observed and no corporate funds have been siphoned off), it is not necessary to prevail on all of the

factors.  Harco, 1989 WL 110537 *5.  There is evidence in the record to raise a genuine issue of material fact as to whether GSW corporation was adequately capitalized, whether it was insolvent and, in general, whether it was ever in a position to function on its own as a viable economic entity.  *See*, UBS's statement of undisputed facts, 90, 91, 92, PF 92a.  Plaintiffs have also shown that GSW's officers and directors were UBS employees, UBS paid GSW's expenses and UBS kept some records and books for GSW.  More importantly, plaintiffs have also raised a genuine issue of material fact as to whether GSW functioned as a façade for UBS with respect to the 1985 sale of the B Bonds.  The court therefore concludes that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether GSW and UBS operated as a single economic unit.[14]

In its papers, UBS contends that plaintiffs cannot demonstrate undue domination or control of GSW by UBS because, prior to the offering and sale of the B Bonds, GSW pledged all it had to the Trustee and the Trustee exercised control over GSW's assets and GSW's business for the benefit of the B Bondholders.  UBS emphasizes that Judge Burrage in the Stephens case found that

> GSW was structured as a bankruptcy-remote, single purpose entity as required by the Indenture for the protection and benefit of the Bondholders to assure that

---

[14] Even if the court were to find insufficient evidence to raise a genuine issue of material fact that UBS and GSW operated as a single economic entity, the Delaware Supreme Court in Pauley stated that corporate entities may be disregarded "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it."  239 A.2d at 633.  As hereinafter discussed, the court finds that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether GSW was used by UBS for conduct in contravention of law or to work a public wrong.  *See*, David v. Mast, 1999 WL 135244 (Del Ch. Mar. 2, 1999) (piercing the corporate veil where corporation's sole shareholder misused the corporate form by having the corporation engage in unfair trade practices in violation of Delaware law which the court found to constitute a "public wrong").

> they were not subjected to credit risks from the issuer's
> business operations unrelated to R&B and the real estate
> securing the Bonds.

Ex. 2 to Turner Affidavit, p. 4. As to Judge Burrage's finding of fact, the court notes that it was an undisputed fact. *Id.* at p. 1 ("The relevant undisputed facts are as follows.") In this case, however, plaintiffs do contest the finding and there is evidence in the record to raise an issue as to whether GSW was bankruptcy remote in 1985 when the B Bonds were sold. PF 16c, PF 20a, 57a - 57f, 88a and 92a. In addition, plaintiffs raise an issue of material fact as to whether GSW's corporate form and substance were fully disclosed in the Prospectus, as argued by UBS. UBS contends that GSW had a legitimate business purpose (*i.e.*, to issue the B Bonds), its existence was validated by multiple opinions of independent counsel, and its financial statements were reviewed by independent accountants. However, plaintiffs have presented evidence of activities of GSW in relation to the sale of the B Bonds of which independent counsel and accountants were unaware. *See*, Netjets, 537 F.3d at 177 (plaintiff need not prove that the corporate was created with fraud or unfairness in mind; it is sufficient to prove that it was so used); *see also*, 33a, 57a-57f, 88a, 92a, and 100c. Moreover, while GSW pledged its assets to the Trustee, plaintiffs have presented evidence that the Trustee did not control GSW with respect to the sale of the B Bonds. PF 23a.[15]

### (ii). Contravention of Law, Public Wrong, Injustice or Unfairness

UBS contends that because plaintiffs are seeking to recover payment of the B Bonds on a breach of contract theory, plaintiffs must show the fraud in order to pierce

---

[15] Although the court has concluded that plaintiffs get past defendants' motion for summary judgment on the single economic entity issue, it goes without saying, but will be said here, that the niceties of the single economic entity concept, as applied in the case at bar, will have to be carefully addressed at the jury instruction stage.

the corporate veil of GSW. Specifically, UBS asserts that plaintiffs must show that GSW was a sham and existed for no other purpose than as a vehicle for fraud. The court disagrees. In Pauley, the Delaware Supreme Court determined that other grounds exist to pierce the corporate veil, including "contravention of law or contract, public wrong or whether equitable considerations among members of the corporation require it." Pauley, 239 A.2d at 633; *see also*, Harco, 1989 WL 110537 at *5; Mabon, 1988 WL 5492 at *3. The corporate veil may be pierced where the companies operated as a single economic entity and an overall element of injustice or unfairness is present. Harco, 1989 WL 110537 at *4; Netjets, 537 F.3d at 176. Moreover, the Delaware cases cited by UBS for its position that fraud must be shown to pierce a corporate veil in a breach of contract case ultimately rely upon Wallace *ex rel.* Cencom Cable Income Partners II, L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999). However, the court in Wallace provides no authority for its declaration that the alter ego theory requires that "the corporation must be a sham and exist for no other purpose than as a vehicle for fraud" and that comment, in passing, is not a specific holding in that case. Literal adherence to that statement would wipe the slate clean of a substantial body of law from Delaware and other jurisdictions. The court rejects UBS's argument that plaintiffs must show that GSW was a sham and existed for no other purpose than as a vehicle for fraud.

Although fraud is not required, inherent in the second alter ego prong is a requirement of a showing of injustice or unfairness. Harco, ("'[A]n overall element of injustice or unfairness must always be present. . . .'") (quoting Golden Acres, 702 F. Supp. at 1104). Plaintiffs, in their papers do not challenge that they must show injustice or unfairness in the use of the corporate form, i.e. the corporate structure itself must be used to effect the injustice or unfairness. Mobil Oil, 718 F. Supp. at 269. Nor do they dispute that the underlying claim for breach of contract cannot provide the requisite injustice or unfairness. *Id*. at 268-269.

Despite UBS's arguments to the contrary,[16] the court concludes that plaintiffs have adduced evidence adequate to raise a genuine issue of material fact as to whether UBS used GSW to work an injustice or unfairness.  Plaintiffs have raised a genuine issue of material fact, as previously discussed, as to the existence of certain material omissions in the Registration Statement and Prospectus.  In the court's view, a jury could reasonably find that these omissions violated the policies of Section 11 of the Securities Act of 1933.  In addition, the court concludes that a reasonable jury could find that a violation of law, or a public wrong, was committed by GSW under the control and direction of UBS.  A reasonable jury could find that UBS used GSW to sign Registration Statement, with the Prospectus, to enable UBS to sell to the public the B Bonds – arguably damaged goods salable only if their condition was not easily ascertainable – that it had purchased and could not sell to institutional investors.  Although defendants assert that there is no evidence that plaintiffs read or relied upon the alleged omissions, UBS has not disputed that reliance is not required under Section 11.  15 U.S.C. § 77k.  The court concludes that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to the second prong of the alter ego test.

In its papers, UBS contends that plaintiffs cannot show an injustice or unfairness because UBS exercised good faith in the subject transaction.  UBS asserts

---

[16]  In its papers, UBS relies in part on Judge Burrage's ruling in the Stephens case that omissions regarding the weak Tulsa real estate market and the tenuous financial prospects of R&B did not relate to "the use of the corporate form of GSW."  Ex. 2, Turner Affidavit, p. 14.  However, the court concludes that plaintiffs have presented evidence to raise a genuine issue of a material fact to show a misuse of the corporate form in regard to the omissions at issue in this case.  *See*, David v. Mast, 1999 WL 135244 (Del. Ch. Mar. 2, 1999) (piercing the corporate veil due to sole shareholder's misuse of corporate form to make misrepresentations which constituted an unlawful trade practice).  UBS contends that the Mast court held that there was a "misuse of the corporate form to perpetuate an inducement by deception contrary to law."  *Id*. at *3.  Unlike the Mast case, UBS asserts that plaintiffs cannot show an inducement to purchase the B Bonds and cannot show the alleged omissions were the proximate cause of their loss.  However, under Section 11, reliance on the alleged omissions is presumed.  15 U.S.C. § 77k.

that it invested $10 million of its own funds in the transaction and deferred its fee for the R&B transaction for 15 years.  In addition, UBS points out that UBS employees most knowledgeable about the transaction personally invested their own money in buying over $6 million of the same B Bonds.  Plaintiffs challenge, with appropriate evidentiary materials, much of the evidence presented to demonstrate UBS's alleged good faith.  PF 106a-117a.  In addition, the case cited by UBS to support its argument, Donohoe v. Consolidated Operating & Production Corp., 30 F.3d 907, 912 (7th Cir. 1994), addressed the good faith affirmative defense to a control person liability claim under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), and Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o.  UBS has not cited any cases from Delaware addressing good faith in relation to the alter ego theory of liability.  The court concludes that UBS has not made a showing of good faith that is sufficient to support entry of judgment as a matter of law in its favor with respect to plaintiffs' attempt to pierce the corporate veil in this case.

UBS also contends that plaintiffs' theory, even if accepted, does not make any sense.  UBS asserts that it had direct statutory liability under Section 11 for actionable omissions in the Prospectus.  It is not possible, UBS asserts, to have used GSW to evade that statutory liability.  Plaintiffs counter that UBS has failed to show that it is necessary under Delaware law to have used GSW to evade liability in order to pierce the corporate veil.  In any event, plaintiffs contend that UBS's liability under Section 11 was shielded by having GSW sign the Registration Statement.  The B Bonds, plaintiffs assert, did not mature until well after direct liability was terminated under 15 U.S.C. § 77m.

The court agrees with plaintiffs that it is not necessary to show that UBS used GSW to evade liability in order to pierce the corporate veil.  UBS relies upon In re Sunbeam Corp., 284 B.R. 355, 369 (Bankr. S.D.N.Y. 2002), on this point.  The authority cited to support the argument does not suggest that plaintiffs must show that UBS sought to evade statutory liability in order to pierce the corporate veil.

UBS also argues that piercing the corporate veil is an equitable remedy and there is no showing that plaintiffs read or relied on the Prospectus. It contends that plaintiffs cannot show any loss as a result of the injustice or unfairness, maintaining that the loss to plaintiffs was due to the unforeseen and unprecedented downturn in the oil market which was catastrophic to R&B's business. Plaintiffs counter that reliance is presumed under Section 11 and the B Bonds should never have been sold with the material omissions. Plaintiffs also assert that UBS's case authority is not based upon Delaware law and is distinguishable.

The court concludes that UBS has not shown as a matter of law that plaintiffs cannot establish loss as a result of the alleged omissions, violative of Section 11. As pointed out by plaintiffs, reliance on the Registration Statement and Prospectus is presumed. 15 U.S.C. § 77k(a). In addition, the court notes that the case relied upon by UBS in support of its loss causation argument, Matter of Palmer Trading, Inc., 695 F.2d 1012, 1018 (7th Cir. 1982), was called into doubt by the Seventh Circuit in Van Dorn Co. v. Future Chemical and Oil Corp., 753 F.2d 565, 570 (7th Cir. 1985), for applying the strict three-part test for piercing the corporate veil from Steven v. Roscoe Turner Aeronautical Corporation, 324 F.2d 157, 160  (7th Cir. 1963),  instead of applying state law. The other two cases, Bastian v. Petren Resources Corp., 892 F.2d 680, 685 (7th Cir. 1990) and In re Williams Securities Litigation – WGS Subclass, 558 F.3d 1130, 1142-1143 (10th Cir. 2009), did not involve the application of alter ego theories of liability. The court thus concludes that summary judgment is not appropriate on this ground.

 UBS also contends that the policies of Section 11, even if sufficient to pierce the corporate veil, do not support plaintiffs' claim. According to UBS, Section 11 restricts damages to the decline in market value of the securities. UBS contends that Section 11 precludes the "benefit-of-the-bargain" damages sought by plaintiffs. UBS asserts that plaintiffs have recovered more than they initially invested in light of the foreclosure of the Property and related litigation. Moreover, UBS argues that as a

matter of legislative policy, any violation of Section 11 was extinguished over 24 years ago by the three year statute of repose under 15 U.S.C. § 77m.

Plaintiffs respond that they are not alleging a claim under Section 11, but rather are alleging a breach of contract claim. Consequently, they argue that they are seeking to recover the payment of the B Bonds and not the damages recoverable under Section 11. According to plaintiffs, "legislative policy" does not include the specific provisions of the Act, but rather refers to the public purpose of the Act. Further, plaintiffs contend that the statute of repose, 15 U.S.C. § 77m, is not a legislative policy. In any event, it is only applicable to a Section 11 claim, which plaintiffs insist they do not press in this case.

The court agrees that plaintiffs are not precluded from receiving benefit-of-the-bargain damages because they are relying upon the policies of Section 11 in support of their alter ego theory of liability. Plaintiffs are not asserting a Section 11 claim. They seek to recover payment of the B Bonds by piercing the corporate veil. The court also agrees with plaintiffs that UBS has not shown that the statute of repose is, in any sense relevant to this case, part and parcel of the legislative policy of Section 11, so as to require application of the statute of repose to vitiate plaintiffs' alter ego theory.

Finally, in its Notice of Supplemental Authority (doc. no. 246), UBS cites On Command Video Corporation v. Roti, 705 F.3d 267 (7th Cir. 2013), wherein the Seventh Circuit, through Judge Posner stated:

> There is no fraud or injustice, hence no basis for piercing a corporate veil, without reliance by a would-be piercer . . . A creditor will not be heard to complain about having extended credit to an assetless corporation if he knew or should have known it was assetless.

Id. at 274 (citations omitted). UBS argues that the Prospectus disclosed that GSW had limited equity capital; could not be viewed as a source of payment for the B Bonds;

had not earned and did not expect to earn substantial income, and had no stockholders' equity or retained earnings. In addition, UBS asserts that, as found by Judge Burrage, GSW was structured as a bankruptcy-remote single purpose entity as required by the Indenture for the protection and benefit of the Bondholders. UBS maintains that the R&B transaction was a customary and usual sale-leaseback real estate financial transaction for which GSW served a legitimate business purpose. Because the Prospectus fully disclosed GSW's capitalization and financial prospects and plaintiffs have disclaimed any reliance upon GSW's ability to pay the B Bonds, UBS contends, citing Roti as well as Judge Burrage's decision in Stephens, that plaintiffs cannot show any injustice to support piercing the corporate veil.

The court concludes that the Roti case does not support the entry of summary judgment. Initially, the court notes that Roti applies Illinois law rather than Delaware law. In addition, the court finds that the facts of Roti are distinguishable from the instant case. While plaintiffs rely upon GSW's undercapitalization as a fact supporting the "single economic entity" contention, they do not rely upon GSW's undercapitalization as a basis for piercing the corporate veil. This distinguishes the instant case from the Stephens case as well. Plaintiffs have not alleged reliance on the capacity of GSW to pay the B Bonds. They do not complain of having extended credit to an assetless corporation. Further, as previously discussed, plaintiffs, unlike plaintiff in the Stephens case, challenge (with evidentiary support) whether GSW was a bankruptcy remote, single purpose entity in the 1985 offering of the B Bonds. They also challenge whether the sale-leaseback financing transaction at issue in this case was "customary and usual." The court therefore concludes that the Roti decision does not support entry of summary judgment in this case.

### C. The Instrumentality Theory

In support of the instrumentality theory of liability, plaintiffs cite Irwin & Leighton, Inc. v. W.M. Anderson Company, 532 A.2d 983 (Del. Ch. 1987). The issue

in that case was whether a creditor, involved in the management of its troubled debtor, could be held liable for a troubled debtor's debt to a third person.  The court discussed what it labeled as the "The Control or Instrumentality Theory."  In so doing, the court stated that "[t]he protection offered by the corporate form . . . is not absolute" and that "equity ha[d] long acted to extend corporate liability to those in control of the corporation in appropriate circumstances."  *Id*. at 987.  The court acknowledged that "[t]he paradigm instance involves the use of a corporate form to perpetrate a fraud," however, it also stated that "conduct short of active intent to deceive required to establish fraud may, nevertheless, occasion the 'piercing of the corporate veil.'" *Id*. at 987.

The court then turned to the Fifth Circuit's decision in <u>Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.</u>, 483 F.2d 1098 (5th Cir. 1973), for the legal standards to apply when a creditor corporation seeks to hold another creditor corporation[17] liable "on the theory that the second creditor dominated and controlled the corporation to such extent that it could be said to have used it as an instrumentality of its own."  <u>Irwin & Leighton, Inc.</u>, 532 A.2d at 987.  The <u>Krivo</u> court held:

> [T]wo elements are essential for liability under the 'instrumentality' doctrine.  First the dominant corporation must have controlled the subservient corporation and second, the dominant corporation must have proximately caused plaintiff harm through misuse of this control.

*Id*. at 987 (quoting).  As to the first element, the court in <u>Irwin & Leighton</u> again turned to <u>Krivo</u> which concluded:

> An examination of 'instrumentality' cases involving creditor-debtor relationships demonstrates that courts require a strong showing that the creditor assumed actual, participatory, total control of the debtor.  Merely taking an

---

[17]   The classic situation would involve a trade creditor seeking to impose liability on an institutional lender for obligations incurred by a common obligor.

active part in the management of the debtor corporation
does not constitute [such] control.

*Id*. at 988 (quoting <u>Krivo</u>, 483 F.2d at 1105).  The <u>Irwin & Leighton, Inc.</u> court went
on to state:

Observation of appropriate formalities by those controlling
a corporation is typically regarded as an important
consideration because it demonstrates that those in control
of a corporation treated the corporation as a distinct entity
and had a reasonable expectation that the conventional
attributes of corporateness, including limited liability,
would be accorded to it.

\* \* \* \*

Beyond according respect for the formalities some weight,
however, the cases inevitably tend to evaluate the specific
facts with a standard of "fraud" or "misuse" or some other
general term of reproach in mind.  When the cases
extending liability to a *creditor* in control of a corporation
are reviewed, two generalizations emerge.  First in most of
those cases, the creditor or its affiliate was active in the
formation of the debtor corporation and was not simply an
arms-length extender of credit.  Second, in each of those
instances, I have found the corporation was from the outset
operated as an arm of the creditor's (or an affiliate's)
business.

\* \* \* \*

Where, as here, the third party creditor became involved
with the corporation as the result of an arms-length
extension of credit or other arms-lengths transactions and
thereafter comes to exercise control over the debtor by
reason of default or threatened default, such a creditor has
not been held to thereby assume liability for its debtor's
obligations.

*Id*. at 989. (emphasis in original).  Ultimately, the court in <u>Irwin & Leighton, Inc.</u>
declined to pierce the corporate veil.  According to the court, the record

74

> contains no basis to conclude either that [creditor] so
> controlled [debtor] at any relevant time to justify the
> conclusion that equity should disregard the corporate status
> of [debtor] or that [creditor] has been guilty of any
> "misuse" or "fraud" or other wrong justifying holding it
> derivatively liable for [debtor's] breach of contract.

*Id.*

Applying the standards of <u>Irwin & Leighton, Inc.,</u> to this case, and in contrast to that court's conclusion, the court finds that summary judgment is not appropriate on the instrumentality theory of liability. Upon review of the evidence in the light most favorable to plaintiffs, the court concludes that plaintiffs have presented evidence sufficient to raise a genuine issue of material fact as to whether UBS assumed "actual, participatory, total control" of GSW. The court also concludes that plaintiffs have presented sufficient evidence to raise a genuine issue of material fact as to whether UBS misused its control of GSW, resulting in the omissions in the Registration Statement and the Prospectus, all in violation of Section 11. The court likewise finds that plaintiffs have presented adequate evidence to raise a genuine issue of material fact as to whether the asserted misuse of control of GSW proximately caused the harm complained of by the plaintiffs.

In sum, the court finds that UBS is not entitled to summary judgment on any of the theories of liability asserted by plaintiffs against UBS.

VI. <u>Conclusion</u>

Based upon the foregoing:

1. The Motion of Plaintiffs for Partial Summary Judgment Against Greater Southwestern Funding Corporation (doc. no. 147) is **DENIED**;

2.      The Motion of Defendant UBS Financial Services, Inc. For Summary Judgment (doc. no. 149) is **DENIED**;

3.      Defendants' Motion for Summary Judgment (doc. no. 151) is **GRANTED in part** and **DENIED in part**, as is more fully set forth in this order;

4.      Defendants' Motion to Certify Question to State Court (doc. no. 252) is **DENIED**; and

5.      The Motion of Defendants Requesting Court to Take Judicial Notice (doc. no. 253) is **GRANTED**.

DATED March 26, 2013.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

310-0284p056.wpd